435 S.E.2d 162

**In re JEFFREY R.L., Juvenile.**

**No. 21535.**

Supreme Court of Appeals of
West Virginia.

Submitted April 7, 1993.

Decided June 14, 1993.

Jane Moran, Williamson, Guardian ad litem.

V. Alan Riley, Keyser, for appellee, Gail L.

Darrell V. McGraw, Jr., Atty. Gen., Charlene A. Vaughan, Sr. Asst. Atty. Gen., Charleston, for West Virginia Dept. of Health and Human Resources.

James E. Smith, Keyser, Guardian ad litem below, appellee.

Cinda L. Scales, Askin, Burke & Schultz, Martinsburg, for appellee, Jeffrey L.

Kelley A. Kuhn, Asst. Pros. Atty. for Mineral County, Keyser, amicus curiae.

Mary M. Downey, Facilities Review Panel, Juvenile Justice Committee, Charleston, amicus curiae.

McHUGH, Justice:

Jane Moran, who was appointed as guardian *ad litem* to represent Jeffrey R.L. in this appeal,[1] seeks review of an order of the Circuit Court of Mineral County which transferred physical custody of Jeffrey R.L. to his mother, Gail L., and directed the West Virginia Department of Health and Human Resources (hereinafter "DHHR") to monitor the situation with home visits. The guardian *ad litem* asserts that: (1) the circuit court erred in failing to terminate the parental rights of Jeffrey R.L.'s parents; (2) the circuit court abused its discretion in returning Jeffrey R.L. to his mother's custody without substantial evidence to support the ruling; and (3) Jeffrey R.L.'s best interests were not adequately represented before the circuit court. The Facilities Review Panel, commonly known as the Juvenile Justice Committee, has filed an amicus curiae brief urging this Court to adopt guidelines for attorneys who represent children in abuse and neglect cases to follow in order to ensure effective representation of their clients in those proceedings.

---

1. We follow our traditional practice in cases involving sensitive facts and use initials to identify the parties rather than their full names. *See In re Scottie D.,* 185 W.Va. 191, 406 S.E.2d 214 (1991).

## I

At the outset, we point out that it is necessary to set forth the facts before us in detail because of the nature of this proceeding and the decision we make. Gail L. gave birth to Jeffrey R.L. on May 23, 1991. Jeffrey's birth was a normal vaginal delivery; however, Jeffrey suffers from hemangioma, an overgrowth of blood vessels on the back of his neck. He has been receiving treatment from Bilal Itani, M.D. for his hemangioma and recurring vomiting since his birth. X-rays of Jeffrey were taken for his medical problems on May 24, 1991 and July 26, 1991. These x-rays revealed no trauma or fractures.[2]

Gail L. arranged for Jeffrey R.L. to be examined again by Dr. Itani on August 30, 1991, because he was not moving his right arm in the same way he was moving his left arm. The x-rays taken by Dr. Itani revealed fractures to his skull, clavicle, ribs, arms and legs. Upon reviewing these x-rays, Dr. Itani arranged to have Jeffrey R.L. transferred to West Virginia University Hospital for further evaluation and treatment.

Although Gail L. and her grandparents had asserted that the injuries were the result of a genetic bone disease, the staff at West Virginia University Hospital confirmed that Jeffrey R.L. had sustained fifteen fractures to his skull, clavicle, ribs, arms and legs, which were at various stages of healing, and that these fractures were not disease-related. The physicians instead diagnosed that Jeffrey was suffering from battered child syndrome.

Upon receiving the diagnosis from West Virginia University Hospital, Grant Hospital, where Dr. Itani was employed, filed a report of child abuse with the Child Protective Services of the DHHR. On September 5, 1991, the DHHR worker assigned to the case, Barbara Mosier, and State Trooper Scott Goodnight went to Gail L.'s home to investigate the report of child abuse. Ms. Mosier found that Gail L., her husband Jeffrey L.,[3] her grandmother and her grandfather were all caretakers of Jeffrey R.L. Gail L., who denied knowing the cause of Jeffrey's injuries, suggested that perhaps he sustained these injuries while rolling around in his crib. Upon examining the crib, however, Ms. Mosier observed that the inside of the crib was well-padded.

By order dated September 9, 1991, the DHHR was granted emergency custody of Jeffrey R.L. The DHHR then filed a petition in the circuit court seeking to have the parental rights to Jeffrey R.L. terminated, and requesting that it be granted guardianship of him. A preliminary hearing on the petition was held before the circuit court on September 19, 1991. The DHHR presented two witnesses at the hearing, Ms. Mosier and William Thomas Corder, M.D., Jeffrey R.L.'s attending pediatric physician upon discharge from West Virginia University Hospital. The guardian *ad litem* before the trial court presented no testimony.

Dr. Corder testified that Jeffrey R.L. was examined by a pediatric neurologist, a genetics expert, an orthopedist and an ophthalmologist. Dr. Corder testified that all of the experts consulted, with the exception of the ophthalmologist who only ruled out osteogenesis imperfecta,[4] concluded that Jeffrey R.L. was suffering from battered child syndrome.[5] Dr. Corder testified that it would be impossi-

---

2. The x-ray report dated May 24, 1991, found a "[n]ormal newborn chest." The x-ray report dated July 26, 1991, stated that "[t]he organs, soft tissues, and bones appear normal as visualized. There is no evidence of fecal retention or bowel dilatation."

3. Jeffrey L. has represented to this Court that "he desires to remain mute" on the issue of whether the circuit court erred in returning Jeffrey R.L. to his mother, and requests that this Court decide this issue based upon the best interests of the child and the evidence presented to the circuit court.

4. The ophthalmologist was consulted because a symptom of osteogenesis imperfecta, a congenital bone disease causing the bones to fracture easily, is a thin cornea. Jeffrey R.L.'s cornea, however, showed normal thickness.

5. Dr. Corder testified that he placed a "ninety-six hour hold" on Jeffrey R.L. until the courts could decide where to place the child because he felt that "it would not be appropriate to send him ... back into the environment where he had sustained the injuries."

ble for Jeffrey R.L. to have sustained all of his fractures from rolling around in his crib, that great force would be necessary to cause fractures of the ribs, and that the other fractures he sustained were "consistent with a twisting, torsion, shaking of limbs[.]"[6] Dr. Corder also testified that when he first saw Jeffrey R.L. he thought the child was blind because most three-month-old children enjoy looking at faces and Jeffrey R.L. did not look at his face.[7] After a few days of interacting with the nurses, however, Dr. Corder testified that Jeffrey R.L. "started regarding faces[.]"

Ms. Mosier testified at the hearing that she became involved in the case following a referral from Grant Memorial Hospital. Ms. Mosier testified that she spoke with the physicians at West Virginia University Hospital who told her that they believed Jeffrey R.L. suffered from battered child syndrome. Ms. Mosier testified that she then spoke to both of the parents who stated that the child could have a bone disease that caused the frac-

tures, that he could have hurt himself rolling around in his crib, or that he could have sustained the fractures during his delivery.[8] Ms. Mosier examined the child's crib and found it to be well-padded on the inside. Ms. Mosier then found out through the hospital that Jeffrey R.L. did not have a genetic bone disease, and that he had a normal delivery.

At the conclusion of the preliminary hearing, the court found probable cause to believe Jeffrey R.L. was an abused or neglected child, and concluded that temporary custody should be awarded to the DHHR. The court ordered controlled visitation and directed that the parents undergo psychological evaluations.

Both parents were evaluated by Gregory Trainor, M.A., in October of 1991. With respect to Jeffrey R.L.'s father, Mr. Trainor reported that Jeffrey L. acknowledged that he experienced black-outs, but denied any recent violent behavior.[9] Mr. Trainor found that his "dissociative experiences are particularly disturbing and may represent some

---

6. Dr. Corder further testified that he went over Jeffrey R.L.'s x-rays with the radiologist, and that they were able to determine that the fractures were at different stages of healing. While there was a question raised as to when the various fractures were inflicted, the record shows that x-rays taken of Jeffrey R.L. on May 24, 1991, and July 26, 1991, revealed no fractures. Thus, it appears that these fractures were sustained between July 26, 1991, and the date Jeffrey R.L. was examined by Dr. Itani on August 30, 1991.

7. Dr. Corder gave the following response when asked whether there were any other indications that Jeffrey's development was not normal up until this point:

A. Several people had noted something that concerned me from a developmental aspect. When a child, well when you examine a child of three months of age, they like to look at a face. In fact if I were examining a child, if this microphone was a child and a three month old I wouldn't hold up a toy. They wouldn't regard that at all. What they like is to look at a face. And the way you look at the extraocular movements would be to actually get down and have a child close to your face. They just love to look at faces. When I walked into the room the first time he didn't regard me at all, no regard at all, and at first I thought the child was blind so I checked him for light reflexes. It was like literally walking up to someone who is staring a hole through you and that con-

cerned me. Several other people had also found that too. Over the next couple of days and, you know, I noticed when the nurses were feeding him and so forth he started regarding faces, following them and so forth. You know, he had much more normal appearance in interaction.

8. In reports submitted by Gregory Trainor, M.A., another explanation given by his parents for Jeffrey R.L.'s injuries was that he had rolled off his father's chest while he was sleeping with him and that his father may have rolled over onto him.

9. Mr. Trainor also reported that Jeffrey L. told him he usually takes his anger out on himself and that Jeffrey L. described an incident where Gail L. was physically abusive to him:

[Jeffrey L.] reported that he tends to take his anger out on himself, particularly hitting his head on things. He reported the last time he did this was three months ago after an argument with his wife where he struck his head against the wall with enough force to put a hole in it. He reported an incident again with his wife where she had kicked him in the groin and scratched him and he responded by holding her by the wrists so as to obtain her attention to try to talk this disagreement out. She had complained that he was hurting her when doing this. He acknowledged that his 'wife has a temper on her.'

brief psychotic episodes." Mr. Trainor recommended that Jeffrey L. undergo a psychiatric evaluation to determine whether he needed medication.

With respect to Jeffrey R.L.'s mother, Mr. Trainor believed that she had "at least some serious inattention difficulties" and that she was quite dependent on others.[10] Mr. Trainor suggested that her denial of problems indicates that she would not be "a very good candidate for counseling."[11] Mr. Trainer opined that it was "difficult to comprehend that this situation could have continued as long as it did in ones own home without some realization that there was some serious difficulty." Mr. Trainor further opined that "[t]he implication here is that [Gail L.] may be quite wrapped up in her own world and not ... able to focus resources on the care of this child." Mr. Trainor believed that it was very important to identify who caused Jeffrey R.L.'s injuries, and that Gail L.'s "apparent lack of serious motivation to uncover this does not augur well with this goal."

An adjudication hearing was held on November 20, 1991, in response to the DHHR petition to have Jeffrey R.L. found to be an abused child. Both parents admitted at the hearing that some trauma to their child had occurred, but neither one of them admitted to harming the child or identified the abuser. The court found that Jeffrey R.L. was an abused child, granted the parents an improvement period and ordered custody to remain with DHHR during the improvement period. DHHR was also ordered to develop a treatment plan for the parents to complete during the improvement period.

A hearing was held in January of 1992, at which time Mr. Trainor testified that he did not believe Gail L. was active in her child's abuse and that Gail L.'s grandfather had stated that Jeffrey L. confessed to abusing the child.[12] Mr. Trainor also stated that he would not be opposed to visitation between Gail L. and Jeffrey R.L. in her grandparents' home. The circuit court then entered an order continuing visitation twice a week, and ordered that if a treatment plan was not signed by the parties by February 10, 1992, then the parties would have to appear before the court for another hearing.

The parties appeared before the circuit court again on March 20, 1992 and March 25, 1992, to consider Gail L.'s challenge to the amended treatment plan and to consider further progress in this matter. At the hearing, the DHHR pointed out that Gail L. continued to refuse to sign the treatment plan because she asserted that it failed to address future visitations with the child nor did it provide for ultimately returning the child to his home.

At the hearing held on March 25, 1992, the court heard testimony from several witnesses. Vickie House, a family services specialist with Telamon Corporation, and Bobbie Harman, a case manager at Burlington Children's Placing Agency, testified at the hear-

10. Mr. Trainor also observed that Gail L. showed "no emotionality about the loss of her child or apparent concern over [his] injuries except for some resentment over the way they felt they had been treated by the physicians and by the Department of Human Services."

11. Gail L. also related to Mr. Trainor some "physical struggles" she had with her husband. Mr. Trainor reported that:

[Jeffrey L.] will grab her by the wrists rather forcefully and keep her from going off to herself. She reported his grabbing her hard enough to leave bruises. She also said he will sit on her to restrain her. These actions were reported to keep her from walking away. She reports that these interactions occur as a result of her being upset with him. She felt that his feelings get hurt rather easily. She reported

that he has never struck her but does engage in some self injurious behavior himself.

Gail L. also gave similar testimony regarding these incidents with her husband at the hearing held on March 25, 1992.

12. Jeffrey L. has denied that he abused his son. Furthermore, in a letter dated October 28, 1992, R.L. Catlett, a polygraph examiner, stated that after testing the grandfather concerning Jeffrey L.'s alleged confession, Mr. Catlett believed the grandfather's allegations were not true. Mr. Catlett also stated that, after testing Gail L. and Jeffrey L., he did not believe that either one of them had caused the child's injuries. We further note, however, that polygraph test results are not admissible in evidence in a criminal trial in this State. Syl. pt. 2, State v. Frazier, 162 W.Va. 602, 252 S.E.2d 39 (1979).

ing that Gail L.'s parenting skills had improved, and that they did not believe she would cause Jeffrey R.L. any harm. Ms. Harman, however, testified that she believed they still needed to identify who caused Jeffrey R.L.'s injuries.

Ms. Mosier also testified at the March 25, 1992 hearing. Ms. Mosier stated that she believed it was the position of DHHR that unsupervised visitation between Jeffrey and his mother would not occur until the abuser was identified. Ms. Mosier testified that the initial treatment plan had to be modified because Gail L. and her husband, Jeffrey L., were getting a divorce and that it would effect the course of treatment. Ms. Mosier testified that Jeffrey L. had admitted that he has blackouts, and has attempted to hurt himself. Ms. Mosier stated that he acknowledged he needed treatment. Ms. Mosier testified that she had no "hard core evidence" that Jeffrey L. caused his son's injuries. However, Ms. Mosier clarified in her testimony that the statement made by Gail L.'s grandfather that Jeffrey L. confessed to Ms. Mosier that he had battered his son was not true. Ms. Mosier also testified that she had not had any problems in working with Jeffrey L. Ms. Mosier acknowledged that neither Gail L. nor Jeffrey L. had yet completed all of the Telamon program nor had they completed all of the required counseling.

Jerry Borror, assistant supervisor for the DHHR, testified at the March 25, 1992 hearing that if the DHHR does not know who the perpetrator of the abuse is then they believe the child would be at risk to be placed back into the home. Unless the DHHR is satisfied that the perpetrator is identified, Mr. Borror testified that they would move to have the parental rights terminated. Mr. Borror testified that despite what Ms. House and Ms. Harman stated, he believed Gail L.'s parental rights should be terminated. Mr. Borror stated that he had no evidence that either Gail L. or Jeffrey L. caused Jeffrey R.L.'s injuries.

At the conclusion of the hearing on March 25, 1992, the circuit court found that neither of the case plans developed by the DHHR were adequate and required the DHHR to present an amended treatment plan. The court further ordered that after Gail L.'s next counseling session with Mr. Trainor, she would be allowed an unsupervised weekend visitation with her son at her grandparents' house. The court stated that if the first unsupervised visitation was favorable, then another unsupervised weekend would be allowed at Gail L.'s home without her grandparents.

In April of 1992, Jeffrey R.L. was hospitalized so that he could undergo surgery for his hemangioma, and therefore the unsupervised weekend visitation could not occur. The records from Jeffrey R.L.'s hospital stay indicate that he experienced stress because of a conflict between Gail L. and his foster mother over his feeding and care. In a letter dated April 7, 1992, the prosecuting attorney advised the circuit court that a social worker from the hospital contacted Beverly Hill, Jeffrey R.L.'s foster care worker, to inform her that Jeffrey does not eat well for Gail L. and that he became dehydrated during his hospital stay. The physicians at the hospital, therefore, directed the foster mother to be present while Gail L. was visiting her son.

By letter dated April 13, 1992, Mr. Trainor advised the circuit court that, based on the incidents that occurred during Jeffrey R.L.'s hospital stay, he did not believe that the previously planned weekend visit with Gail L. and her grandparents was appropriate at that time. Mr. Trainor explained that

[t]here have been interactions observed, between Gail and her grandparents, that suggest that Gail's care of the baby in their presence is a rather tension producing affair. The anxiety seems to be telegraphed to the baby, resulting in a decrease in his desire to take his formula. The weekend visitations ... should not occur at the present time, pending stabilization in his condition.

Another hearing concerning visitation was held on August 11, 1992. Trooper Goodnight, Gail L. and Beverly Hill, Jeffrey R.L.'s foster care worker, testified. Trooper Goodnight testified that he interviewed Harry Braithwaite, who made a statement regard-

ing an incident he observed between Gail L. and Jeffrey L. while they were with Jeffrey R.L. in front of the "fire hall" in July of 1991. Mr. Braithwaite told Trooper Goodnight that when Jeffrey L. told Gail L. that the baby's diaper needed changing, Gail L. responded that she "ain't cleaning the damned kid." Trooper Goodnight also testified that he interviewed Charles Lee Riggleman, Jr., regarding his visit with Gail L. and Jeffrey L. at their trailer in August of 1991. Mr. Riggleman told the trooper that he went with Jeffrey L. to get the baby from Gail L.'s grandmother's house. When they went into the house to get Jeffrey R.L., Mr. Riggleman told Trooper Goodnight that Gail L.'s grandmother picked up Jeffrey R.L. by the right arm above the elbow and that Jeffrey "screamed" when she did this. Mr. Riggleman also told Trooper Goodnight that he saw Gail L. squeeze her son's chest in front of the fire hall when his diaper needed to be changed again a few minutes after it had been changed before, and that the baby cried as though he were in pain. Trooper Goodnight also testified that when he interviewed Jeffrey L., he believed that he was telling the truth. He further testified that when he interviewed Gail L., he had the impression that "something just wasn't right."

Gail L. was questioned at the hearing about an argument she had with her grandfather. Gail L. testified that she and her grandfather were arguing over the remote control to the television and that he hit her in the nose. Gail L. went to the Burlington Fire Department where the rescue team is located to have someone look at her nose because she thought it was broken. Gail L. admitted that she told the EMT, Karen Davy, that she could not call the police because her grandfather told her if she called them, he would have her placed in jail.

Ms. Hill, the foster care worker, testified that in observing Gail L. with her son, she seemed "a little nervous" and "uncomfortable" in handling him but that it was understandable in light of the fact that several people were watching her. She testified that both parents had been fulfilling the requirements of the case plan. At the conclusion of the hearing, the circuit court concluded that there was not sufficient evidence to terminate the parental rights of Gail L. and Jeffrey L., and directed them to schedule an appointment with Thomas Stein, Ed. D., for an evaluation.[13]

In a progress summary dated August 11, 1992, Mr. Trainor reported that he had made no progress with Gail L. in determining who abused Jeffrey R.L. Mr. Trainor reported that, although Gail L. had made progress on her treatment plan and was attempting to gain more independence from her grandparents, his work with her "has been made difficult by the fact that no one has acknowledged involvement in [Jeffrey R.L.'s] abuse and that that problem has never been directly analyzed and dealt with."

In a letter dated September 28, 1992, Vickie House of the Telamon Corporation stated that although Gail L. and Jeffrey L. had adequately completed their parenting classes, she could not recommend that Jeffrey R.L. be returned to the home until the person who inflicted the abuse is identified.

By letter dated October 29, 1992, the Juvenile Justice Committee was contacted by Dr. Itani, who requested assistance in protecting Jeffrey R.L., and advised them of the proposed unrestricted visitation allowed by the circuit court's order in January, 1992. Dr. Itani wrote that he felt "the child's welfare has not been addressed adequately thus far." Dr. Itani believed that there was strong mother-child bonding between Jeffrey R.L. and his foster mother, and that he called her "mommy."

---

13. Thomas E. Stein, Ed.D., performed a psychological examination of Jeffrey R.L.'s parents and maternal grandparents. He found that Gail L.'s grandparents had "good knowledge" about appropriate child behavior management strategies. Although he diagnosed Gail L. as suffering from "[r]eactive depression" and "[r]elationship problems," he stated that her prognosis was good. With respect to Jeffrey L., Dr. Stein found that he too suffered from "[r]elationship problems" and found that his prognosis was "[f]air with appropriate intervention."

In response to a request by Gail L., a status hearing was held on December 9, 1992. The circuit court denied the motion of the guardian *ad litem* for a stay of the proceedings until he could determine from the investigating officer, Dr. Itani and the foster mother their respective positions in this case. The circuit court then ordered that physical custody of Jeffrey R.L. be returned to his mother. The guardian *ad litem* did not request a stay of execution nor did he initiate an appeal with this Court. The matter has been appealed to this Court by a newly appointed guardian *ad litem,* Jane Moran, on behalf of Jeffrey R.L.

II

The first issue we shall address is whether the circuit court erred in failing to terminate the parental rights of Jeffrey R.L.'s parents, and whether the circuit court abused its discretion by returning custody of Jeffrey R.L. to his mother without sufficient evidence to support the ruling. The guardian *ad litem* asserts that the conditions giving rise to the abusive behavior cannot be substantially corrected when the perpetrator of the abuse has not been identified, and that the best interests of the child preclude returning his custody to either parent. Gail L. contends that: (1) there is insufficient evidence in the record to support termination of her parental rights; (2) there is no evidence that she was the abuser; and (3) she has fulfilled all of the requirements placed upon her by the circuit court and the DHHR. The DHHR contends that Jeffrey R.L. should not have been returned to his mother's custody until the perpetrator of the abuse had been identified and a determination of Gail L.'s ability to provide a safe environment for her son has been made.

In the Court's analysis of child abuse and neglect cases, we must take into consideration the rights and interests of all of the parties in reaching an ultimate resolution of the issues before us. Although the rights of the natural parents to the custody of their child and the interests of the State as *parens patriae* merit significant consideration by this Court, the best interests of the child are paramount. Thus, as an initial matter, we emphasize that the health, safety, and welfare of Jeffrey R.L. must be our primary concern in analyzing the facts and issues before us.

We shall begin our discussion by reviewing the rights of the natural parents to the custody of their children. Relying on the Supreme Court of the United States' decision in *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), we acknowledged the constitutional right of the natural parents to the custody of their children in syllabus point 1 of *In re Willis,* 157 W.Va. 225, 207 S.E.2d 129 (1973):

> In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.

While this Court has repeatedly recognized the constitutionally-protected right of the natural parent to the custody of his or her minor children, we have also emphasized that such right is not absolute. *In re Carlita B.,* 185 W.Va. 613, 408 S.E.2d 365 (1991); *In re Scottie D.,* 185 W.Va. 191, 406 S.E.2d 214 (1991); *Nancy Viola R. v. Randolph W.,* 177 W.Va. 710, 356 S.E.2d 464 (1987); *In re Darla B.,* 175 W.Va. 137, 331 S.E.2d 868 (1985); *In re Willis, supra.* We explained the limits of the natural parent's right to custody of his or her minor children in *In re Willis:* "[T]his Court, early in the history of this State, recognized that the right of the natural parent to the custody of his child is not absolute; *it is limited and qualified by the fitness of the parent to honor the trust of the guardianship and custody of the child.*" 157 W.Va. at 237–38, 207 S.E.2d at 137 (emphasis added).

This Court has also identified the interests of the State where the issue of guardianship and custody of minor children is raised. We have recognized that the State, in its role of *parens patriae,* "is the

ultimate protector of the rights of minors[,]" and "has a substantial interest in providing for their health, safety, and welfare, and may properly step in and do so when necessary." *In re Betty J.W.*, 179 W.Va. 605, 608, 371 S.E.2d 326, 329 (1988). While the State's *parens patriae* interests may favor preservation of the natural family bonds rather than severance of those bonds, "[t]he countervailing State interest in curtailing child abuse is also great." *Id.* We have, therefore, observed that "[i]n cases of suspected abuse or neglect, the State has a clear interest in protecting the child and may, if necessary, separate abusive or neglectful parents from their children." *Id.* Thus, a parent's right to custody of his or her children may be called into question by the State when there is evidence establishing that those children have been subject to abuse and neglect.

■ *W.Va.Code*, 49–1–3(a)(1) [1992] defines an "[a]bused child" as "a child whose health or welfare is harmed or threatened by: (1) A parent, guardian or custodian who knowingly or intentionally inflicts, attempts to inflict, or knowingly allows another person to inflict, physical injury, or mental or emotional injury, upon the child or another child in the home[.]" This Court has recognized, in syllabus point 3 of *In re Betty J.W.*, *supra*, that a parent who "takes no action in the face of knowledge of the abuse" to the child can have his or her parental rights terminated:

> W.Va.Code, 49–1–3(a) (1984), in part, defines an abused child to include one whose parent knowingly allows another person to commit the abuse. Under this standard, termination of parental rights is usually upheld only where the parent takes no action in the face of knowledge of the abuse or actually aids or protects the abusing parent.

■ A parent's rights to custody of his or her child may also be terminated where there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected:

> 'Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected

children, *W.Va.Code*, 49–6–5 [1977] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under *W.Va.Code*, 49–6–5(b) [1977] that conditions of neglect or abuse can be substantially corrected.' Syllabus Point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syllabus point 4, *In re Jonathan P.*, 182 W.Va. 302, 387 S.E.2d 537 (1989). Such termination of parental rights is even more appropriate in cases where the welfare of a child less than three years of age is seriously threatened and there is no reasonably likelihood that the conditions of abuse can be substantially corrected, as we recognized in syllabus point 1 of *In re Darla B.*, 175 W.Va. 137, 331 S.E.2d 868 (1985):

> 'As a general rule the least restrictive alternative regarding parental rights to custody of a child under *W.Va.Code*, 49–6–5 [1977] will be employed; however, courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous placements.' Syl. pt. 1, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

■ Finally, the evidence upon which parental rights may be terminated must be clear and convincing. *W.Va.Code*, 49–6–2(c) [1992]; *Nancy Viola R. v. Randolph W.*, 177 W.Va. at 715–16, 356 S.E.2d at 469–70 (citing cases).

■ Relying upon the well-established principles stated above, we shall now review the facts before us in the present case. To begin with, during the first three months of his life, Jeffrey R.L. was in the care of his mother, father and maternal grandparents. At the helpless age of approximately three months, Jeffrey R.L. was brought to the

hospital when his maternal grandparents showed Gail L. that he was not moving his right arm in the same manner he was moving his left.[14] X-rays revealed that Jeffrey R.L. suffered fifteen fractures to his skull, clavicle, ribs, arms and legs.[15] It is undisputed that Jeffrey R.L. suffered these extensive injuries as a result of physical abuse, and the physicians diagnosed him as suffering from battered child syndrome.

Yet, his mother, Gail L., gave several possible explanations for the injuries to Jeffrey R.L. She stated that he could have suffered these injuries while he was rolling around in his crib. However, the crib was found by the social worker to be well-padded. Gail L. also stated that his injuries could be the result of a genetic bone disease from which her grandfather suffered.[16] Yet, after several tests were performed at West Virginia University Hospital, there was no indication that Jeffrey R.L. suffered from any bone disease. Furthermore, Gail L. offered the explanation that Jeffrey R.L. suffered his injuries during birth, despite the fact that the evidence in the record reveals Gail L. experienced a normal vaginal delivery. None of the evidence in the record supports any of Gail L.'s explanations of Jeffrey R.L.'s injuries.[17]

Although Gail L. admitted to the circuit court at the hearing held on November 20, 1991, that some trauma had occurred to Jeffrey R.L., absent from the record is any evidence which would indicate that Gail L. made any attempts to identify her child's abuser. In fact, as previously noted in this opinion, Mr. Trainor, in his psychological report dated October 3, 1991, found that Gail L. showed "no emotionality about the loss of her child or apparent concern over [his] injuries except for some resentment over the way they had been treated by the physicians and by the Department of Human Services." He also observed that Gail had an "apparent lack of serious motivation to uncover" Jeffrey R.L.'s abuser. Although her grandfather had alleged that Jeffrey R.L.'s father had confessed to him and to a social worker that he had abused Jeffrey R.L., that allegation appears to be without foundation.[18]

Even in the face of knowledge of her son's abuse, there is no indication in the record that Gail L. made any attempts to identify her son's abuser. At the time Jeffrey R.L. suffered these extreme injuries, he was under his mother's care and the care of those individuals with whom she entrusted him. Gail L. is aware of those individuals who cared for her child during the first three months of his life when he was subject to physical abuse; yet, she has never attempted to identify his abuser. Nearly two and one-half years have passed since Jeffrey R.L.

14. There is nothing in the record which indicates that Gail L. was aware of Jeffrey R.L.'s injuries before her grandparents showed her that he was not moving his right arm. The Court questions how a mother could be oblivious to her son's extreme injuries.

15. As we stated above, Dr. Corder testified that great force would be necessary to fracture Jeffrey R.L.'s ribs, and that the other fractures he sustained were consistent with a "twisting, torsion, shaking of limbs[.]"

16. Dr. Corder testified that the grandfather's medical records made no mention that he suffered from osteogenesis imperfecta.

17. As we have previously noted, polygraph test results are inadmissible in a criminal trial. Curiously, however, Gail L. attached as an exhibit to her brief the report of the polygraph examiner, Mr. Catlett, dated March 4, 1993. In that report,

Mr. Catlett stated that "[d]uring the interview, [Gail L.], mother of the infant stated 'she felt the baby was injured at the hospital.'" Gail L.'s statement to the polygraph examiner in March of 1993 suggests that Gail L. continues to offer explanations for Jeffrey R.L.'s fifteen fractures that are inconsistent with the documented medical evidence.

18. As previously noted, n. 12 *supra*, the reader of the polygraph concluded that the grandfather's statement regarding the alleged confession was not true, and Ms. Mosier testified that Jeffrey L. never stated that he physically abused Jeffrey R.L. Even more troubling to this Court is the fact that Gail L. testified at the March 25, 1992, hearing that she heard Jeffrey L. confess to her grandfather that he abused Jeffrey R.L.; yet, the report of the polygraph examiner, Mr. Catlett, dated March 4, 1993, attached as an exhibit to Gail L.'s brief, states that Gail L. "stated she never actually heard her husband say he injured their infant son."

suffered his injuries. By failing to even attempt to identify his abuser during this two and one-half-year period, Gail L. has not shown that she is fully committed to the welfare of her child.[19]

Establishing the identity of the person or persons who inflicted these injuries on Jeffrey R.L. is crucial to his health, safety and welfare. Ms. Mosier, Mr. Trainor, Ms. Harman, Mr. Borror and Ms. House have all stated that Jeffrey R.L. should not be returned to either parent until the perpetrator of his abuse has been identified. Yet, despite the fact that the perpetrator has not been identified, the circuit court returned custody of Jeffrey R.L. to his mother. We find that the circuit court clearly erred in returning Jeffrey R.L. to his mother before the perpetrator who inflicted such extensive physical abuse on this helpless infant has been identified.

There is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of Jeffrey R.L.'s physical abuse has not been identified. Jeffrey R.L., due to his young age and physical condition, needs consistent close interaction with fully committed adults. Jeffrey R.L.'s health, safety and welfare would be seriously threatened if he were to be placed back into the environment where he suffered extensive physical injuries when his abuser has not been identified. Therefore, because it appears that Jeffrey R.L.'s abuser will never be identified, this Court will not place him back into the environment where he suffered his abuse.

We find that: (1) continuation in Jeffrey R.L.'s home is not in his best interests because his abuser has not been identified; (2)

reunification between Jeffrey R.L. and his parents is not in his best interests because his parents have not identified his abuser; and (3) the state department made reasonable efforts to reunify the family, drafted a treatment plan Gail L. refused to sign, arranged for Gail L. and Jeffrey L. to complete a parental training program, and monitored the case. *See W.Va.Code*, 49-6-5 [1992]. Rather than prolong these proceedings, we believe there is clear and convincing evidence before us to warrant terminating parental rights. Thus, this Court believes that in order to safeguard Jeffrey R.L.'s well being, Gail L.'s parental rights to Jeffrey R.L. should be terminated.

In summary, we hold that parental rights may be terminated where there is clear and convincing evidence that the infant child has suffered extensive physical abuse while in the custody of his or her parents, and there is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of the abuse has not been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser. Accordingly, the parental rights of Gail L. and Jeffrey L. to their son, Jeffrey R.L., are hereby terminated.[20] The guardian *ad litem* shall continue to represent Jeffrey R.L. until he is adopted or placed into a permanent home. If the guardian *ad litem* is unable to continue representing Jeffrey R.L., another guardian *ad litem* will be appointed.

### III

By the very nature of the painful issues involved, abuse and neglect cases are troublesome to this Court. Despite our efforts to give the highest priority to child abuse and

---

19. We note that Gail L., who completed her parenting classes, contends she was cooperative with the DHHR. However, she refused to sign the treatment plan.

20. The guardian *ad litem* before this Court asserts that Jeffrey R.L.'s interests were not adequately represented before the circuit court. She points out that the attorney representing the child did not call any witnesses, did not place

any exhibits into evidence, and did not confer with the treating physician or with the foster parents until this petition was filed with this Court. She also asserts that at the hearing in December of 1992, the attorney represented to the circuit court that he had yet to decide whether the child should be placed back with his family. However, because we are terminating parental rights in this case and adopting standards for guardians *ad litem* to adhere to in the future, we need not further address this issue.

neglect cases, we have yet to find viable solutions to all of the problems which arise in these cases. As a result, we continue to explore stronger approaches to facilitate the fair and expeditious handling of child abuse and neglect cases.

The Juvenile Justice Committee has brought to this Court's attention the problems which commonly arise with the representation of children by guardians *ad litem* in abuse and neglect proceedings. Quite often children do not get adequate representation because the guardians *ad litem* have not been given proper direction as to their role in representing the child in abuse and neglect proceedings. Thus, to further our goal of protecting the interests of children who suffer from abuse and neglect, the Juvenile Justice Committee has proposed that this Court adopt guidelines for guardians *ad litem* to follow in order to provide children in abuse and neglect proceedings with adequate representation.

In suggesting the guidelines, the Juvenile Justice Committee represents that it has relied upon our state *Code, Rules of Professional Conduct, Rules of Civil Procedure for Trial Courts of Record* and case law. The Juvenile Justice Committee has also consulted other sources such as: (1) the Department Advisory Committee of the Fourth Department Law Guardian Program in New York, *Guidelines for Law Guardians/Abuse and Neglect Proceedings;* (2) the National Association of Counsel for Children, *Guidelines for Guardians Ad Litem in Abuse and Neglect Cases;* and (3) the New York State Bar Association's study, Jane Knitzer & Merrill Sobie, *Law Guardians in New York State: A Study of the Legal Representation of Children* (1984).

As a brief background, we believe that two studies which were performed, one in North Carolina [21] and the other in New York,[22] to evaluate programs that provide children with attorneys in protection proceedings, illustrate why there is concern about the performance of guardians *ad litem* in child abuse and neglect cases. Robert F. Kelly & Sarah H. Ramsey, *Monitoring Attorney Performance and Evaluating Program Outcomes: A Case Study of Attorneys For Abused and Neglected Children,* 40 Rutgers L.Rev. 1217, 1231 (1988). First, the North Carolina study found, among other things, that experienced attorneys who knew how to represent their child clients and worked hard, spoke with their clients, and involved themselves in the negotiating and fact-finding, had a beneficial influence in the outcome of the case. However, the North Carolina study found that these experienced, hard-working attorneys were in the minority.[23] Kelly & Ramsey, 40 Rutgers L.Rev. at 1239. Among the findings

---

**21.** *See* Robert Kelly & Sarah Ramsey, *Do Attorneys for Children in Protection Proceedings Make a Difference?—A Study of the Impact of Representation Under Conditions of High Judicial Intervention,* 21 J.Fam.L. 405 (1983).

**22.** *See* Jane Knitzer & Merrill Sobie, *Law Guardians In New York State—A Study of the Legal Representation of Children* (1984).

**23.** Several useful lessons were learned from the North Carolina study:

That attorneys had little effect overall is understandable if circumstances surrounding the guardian's role are considered. First, there was much confusion about the role of the guardian ad litem.... This confusion not only prevented the guardian ad litem from having a clear goal, but it was also a source of confusion to the judge who may have resented, criticized, or ignored a guardian ad litem who was taking on responsibilities that the judge felt were inappropriate.... The attorney survey showed that 53% felt that judges expected them to assume an adversarial role in representing their client's position, while 41% felt that judges did not have this expectation, at best an ambivalent situation.... The condition of ambivalence with respect to the expectations of the attorney was not aided by the fact that guardians typically had received no specialized training relevant to abuse and neglect cases, either during law school or thereafter.

Another, and perhaps more critical, factor in limiting attorney effectiveness was that both guardians and judges seemed to assume that the guardian should play only a minor role. Court records from our sample indicated that attorneys spent a median of only five hours per case. Since this figure includes all court time, the time left for investigation, negotiation, or consultation is negligible. Not surprisingly, guardians indicated that they concurred with the department of social services recommendations in 88% of their cases. Additionally, attorneys usually did not follow their cases after the dispositional hearing to see if treatment plans were being carried out. Attorneys, it

of the New York study were that law guardians are uncertain about what is expected of them and that they "feel that they need assistance in their work, in particular, regular briefings on case law and legislation, and access to independent social work and mental health professionals." Kelly & Ramsey, *supra* at 1246. The results of both studies lead to the conclusion that there should be "greater accountability in the performance of individual attorneys, ... systematic and continuing evaluations of program outcomes, and ... enhanced efforts geared toward implementing and testing new approaches to representing children in protection proceedings." Kelly & Ramsey, *supra* at 1250 (footnote omitted).

More recently, the Colorado Bar Association Family Law Section and Juvenile Law Forum established a Joint Guardian Ad Litem Standards Committee for the purpose of developing proposed standards for guardians *ad litem* because of increasing dissatisfaction with the inadequate representation of children and the lack of direction given to the guardians *ad litem*.[24] Marie Walton & Donna Schmalberger, *Standards of Practice for Guardians ad Litem,* 12 ABA Juv. & Ch. Wel'f L.Rptr. pp. 13–16 (March 1993). The goals and requirements of the standards adopted by Colorado's Joint Guardian Ad Litem Committee substantially reflect those of the guidelines proposed in other jurisdictions. Those goals and requirements are succinctly stated under the "Guardian ad Litem Mission Statement" included at the beginning of the standards, where the Committee summarized the role of the guardian *ad litem* and outlined the categories under which the standards are set forth:[25]

The guardian ad litem [GAL] plays an important role in legal outcomes affecting children.... The GAL should take an active role in presenting evidence regarding the child's well-being. Therefore, it is appropriate to describe generally the rights and responsibilities of the attorney who assumes this office. The GAL does not necessarily represent a child's desires but should formulate an independent position regarding relevant issues. To safeguard a child's well being, a GAL must render recommendations.

1. **Attorney of Record:** The GAL assumes a pivotal professional role in litigation. As an attorney of record in the case, the GAL is entitled to be treated professionally with respect and courtesy.

2. **Litigation:** The GAL shall have the right to and should actively participate and be included in all aspects of litigation including, but not limited to, discovery, motions practice, settlement negotiations, court appearances, jury selection, presentation of evidence and appeals.

3. **Education:** GAL practice is unique and complex and, as such, requires special education, training and experience with regard to the needs of children.

4. **Investigation:** The GAL shall conduct a thorough and independent investigation. The GAL shall meet with the child. Relevant evidence should be developed and presented to the court. The GAL may conduct interview[s] with other relevant persons and review exhibits as the GAL deems appropriate. Other parties

appears, were a presence rather than an influence in the court's handling of the cases.
Kelly & Ramsey, 21 J.Fam.L. at 451–52 (footnote omitted).

24. The Colorado Committee's standards are for representation of children generally, and are not limited to child abuse and neglect cases. Furthermore, in some states, such as Minnesota, the guidelines are established for lay people who represent children in a variety of proceedings.

*See* Minnesota Judges Association, *Guidelines for Guardians Ad Litem* (June 1986). *W.Va.Code,* 49–6–2(a) [1992] provides children the right to be represented by an attorney, but makes no provision for children to be represented by lay persons.

25. In order to be concise, we are not listing each of the standards provided under the categories. The categories effectively summarize and reflect the purpose of the standards listed under them.

should fully cooperate with the GAL as the investigation is conducted.

5. **Recommendations:** The GAL should render informed and independent recommendations which serve the child's best interests. The child's wishes should be considered by the GAL, but need not be adopted by the GAL unless doing so serves the child's best interests.

6.ʹ **Compensation:** The GAL shall be entitled to reasonable compensation for services rendered. The court, in recognition of the important role of the GAL, shall encourage timely payment of the fees and costs to the GAL.

All of the guidelines we have reviewed attempt to provide guardians *ad litem* with comprehensive standards, like those in Colorado, so that there is little question as to the attorney's responsibilities in representing children. To begin with, the guidelines issued by the Departmental Advisory Committee of the Fourth Department Law Guardian Program set forth the role of the guardian, and set forth the guardian's responsibilities prior to the guardian's initial appearance, prior to and during the fact-finding hearing, at the predispositional and dispositional hearing, and after disposition. Next, the guidelines suggested by the National Association of Counsel for Children provide standards for an independent investigation by the guardian *ad litem*, preparation for hearings, and "helpful hints" to assist guardians *ad litem*. The standards developed as part of the New York study, Knitzer & Sobie, *supra*, set forth guidelines to be followed by the guardian *ad litem* prior to and during the fact-finding hearing, prior to and during the dispositional hearing, and after disposition.

While the standards recommended in the case before us by the Juvenile Justice Committee conform with the standards discussed above, it is also important to ascertain whether these rules are in accord with applicable rules of practice and case law in West Virginia. In West Virginia, the role of guardian *ad litem* is generally stated in Rule XIII of the *West Virginia Trial Court Rules for* *Trial Courts of Record,* which provides, in pertinent part:

In any proceeding in which a guardian ad litem is appointed, such guardian ad litem shall be selected independently of any nomination by the parties or counsel.

Any guardian ad litem shall make a full and independent investigation of the facts involved in the proceeding; and either by his testimony made of record, or by full and complete answer therein, make known to the court his [or her] recommendations, concerning the action sought in the proceedings unless otherwise ordered or instructed by the court.

Although this Court has not previously adopted guidelines for guardians *ad litem*, we have addressed a child's right to independent counsel in child abuse and neglect cases in *State v. Scritchfield*, 167 W.Va. 683, 280 S.E.2d 315 (1981),[26] and the role of guardians *ad litem* in child abuse and neglect cases in *In re Scottie D.*, 185 W.Va. 191, 406 S.E.2d 214 (1991). We recognized in *In re Scottie D.*, that the guardian *ad litem* is responsible for securing the infant's rights, and that "[s]ecuring the infant's rights includes taking an assertive role and, if in the judgment of the guardian *ad litem*, a case so warrants, prosecuting an appeal." 185 W.Va. at 198, 406 S.E.2d at 221. We summarized the guardian *ad litem's* role in child abuse and neglect cases in syllabus point 3 of *In re Scottie D.:*

In a proceeding to terminate parental rights pursuant to W.Va.Code, 49–6–1 to 49–6–10, as amended, a guardian *ad litem*, appointed pursuant to W.Va.Code, 49–6–2(a), as amended, must exercise reasonable diligence in carrying out the responsibility of protecting the rights of the children. This duty includes exercising the appellate rights of the children, if, in the reasonable judgment of the guardian *ad litem*, an appeal is necessary.

We further elaborated in syllabus point 5 of *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991), that "[t]he guardian ad

---

**26.** *See W.Va.Code,* 49–6–2(a) [1992].

litem's role in abuse and neglect proceedings does not actually cease until such time as the child is placed in a permanent home."

Finally, the proposed guidelines encompass some of the basic principles found under our *Rules of Professional Conduct*. Specifically, Rule 1.1 requires an attorney to "provide competent representation to a client" which "requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Furthermore, Rule 1.3 requires a lawyer to "act with reasonable diligence and promptness in representing a client." We believe the guidelines proposed for guardians *ad litem* essentially reflect these basic rules of practice by which each attorney is bound.

▬▬ In summary, each child in an abuse and neglect case is entitled to effective representation of counsel. To further that goal, *W.Va.Code*, 49–6–2(a) [1992] mandates that a child has a right to be represented by counsel in every stage of abuse and neglect proceedings. Furthermore, Rule XIII of the *West Virginia Rules for Trial Courts of Record* provides that a guardian *ad litem* shall make a full and independent investigation of the facts involved in the proceeding, and shall make his or her ·recommendations known to the court. Rules 1.1 and 1.3 of the *West Virginia Rules of Professional Conduct*, respectively, require an attorney to provide competent representation to a client, and to act with reasonable diligence and promptness in representing a client. The Guidelines for Guardians *Ad Litem* in Abuse and Neglect cases, which are adopted in this opinion and attached as Appendix A, are in harmony with the applicable provisions of the *West Virginia Code*, the *West Virginia Rules for Trial Courts of Record*, and the *West Virginia Rules of Professional Conduct*, and provide attorneys who serve as guardians *ad litem* with direction as to their duties in representing the best interests of the children for whom they are appointed. Therefore, this Court adopts these guidelines, effective within sixty days of the date of this opinion, to further ensure the adequate representation of children in abuse and neglect cases by court-appointed guardians *ad litem*.[27] By adopting the proposed guidelines in this case, we are providing guardians *ad litem* with fairly comprehensive standards which they can follow so that they may conduct an independent investigation of the case and present the child's position to the court. The guardians *ad litem* may use their discretion in acting under the guidelines because the applicability of each of the guidelines is dependent upon the facts of each case.

▬▬ In addition to the guidelines adopted herein, we believe attorneys who act as guardians *ad litem* should participate in special continuing legal education relating to the representation. The attorneys in this State are required under Chapter VII, section 5.2 of the *Constitution, By–Laws and Rules and Regulations of the West Virginia State Bar* to satisfy the following requirements:

¶ 5.2. After the above two year phase-in period, each active member of the state bar shall complete a minimum of twenty-

---

**27.** The compensation and expenses for those attorneys who are appointed to represent children in abuse and neglect cases pursuant to *W.Va. Code*, 49–6–2(a) [1992] fall under the provisions of article 21, chapter 29 of the *West Virginia Code*. *W.Va.Code*, 29–21–2(2) [1990] provides, in relevant part, that "Eligible proceedings" include "child abuse and neglect proceedings which may result in a termination of parental rights[.]" An "Eligible client" is defined under *W.Va.Code*, 29–21–2(1) [1990] as "[a]ny person who meets the requirements established by this article to receive publicly funded legal representation in an eligible proceeding as defined herein[.]"

Thus, abuse and neglect proceedings where parental rights may be terminated are eligible proceedings under the provisions of article 21, chapter 29 of the *Code*. Moreover, a child in an abuse and neglect proceeding is an eligible client under *W.Va.Code*, 29–21–2(1) [1990]. Attorneys, therefore, who are appointed to represent children in abuse and neglect proceedings will submit claims for fees and expense reimbursements to the appointing court in accordance with the provisions of article 21, chapter 29 of the *West Virginia Code*. *See W.Va.Code*, 29–21–13a [1990].

four hours of continuing legal education, as approved by these rules or accredited by the Commission, every two fiscal years. At least three of such twenty-four hours shall be taken in courses on legal ethics or office management. On or before July 31, 1990, and every other July 31 thereafter, each attorney must file a report of completion of such activities. The commission recommends that such report be completed on Form C—Certification of Completion of Approved MCLE Activity.

Furthermore, *W.Va.Code,* 49–6–2(a) [1992] provides that attorneys who represent children in abuse and neglect proceedings should complete a minimum of three hours of continuing legal education on representation of children in child abuse and neglect cases per year. Those three hours are merely included in the 24 hours of continuing legal education already required by the West Virginia State Bar. *W.Va.Code,* 49–6–2(a) [1992] further provides that "where no attorney who has completed this training is available for such appointment, the court shall appoint a competent attorney with demonstrated knowledge of child welfare law to represent the child."

We believe that, because the practice of guardians *ad litem* is rather unique, and at times complex, guardians *ad litem* need specialized education and training to fulfill their responsibilities. While this Court, rather than the legislature, controls the practice of law in this State,[28] we find that the three hour per year requirement of specialized continuing legal education under *W.Va.Code,* 49–6–2 [1992] is in accord with what this Court intends to be the practice for guardians *ad litem.* Therefore, we find that a minimum of three hours of continuing legal education per year, relating to representation of children, for guardians *ad litem* to complete is necessary to ensure the effective representation of children.

IV

Thus, for the reasons stated herein, we reverse the order of the Circuit Court of Mineral County returning custody of Jeffrey R.L. to his mother, Gail L., and terminate the parental rights of Gail L. and Jeffrey L. Furthermore, we adopt the Guidelines for Guardians *Ad Litem* in Abuse and Neglect Cases, set forth in Appendix A, within sixty days of the date of this opinion.

Reversed.

## APPENDIX A

### GUIDELINES FOR GUARDIANS *AD LITEM* IN ABUSE AND NEGLECT CASES

#### *Initial Stages of Representation*

1. Notify promptly the child and any caretaker of the child of the appointment of counsel and the means by which counsel can be contacted.

2. Contact the caseworker and review the caseworker's file and all relevant information.

3. Contact and interview persons such as older children, caseworkers, and caretakers who may have information with respect to the child and obtain names and addresses of hospital personnel, physicians, teachers, law enforcement, and other persons who may have pertinent information regarding the child and interview them.

4. Absent extraordinary circumstances and the child is three or under:

a. If the child is in the care of someone other than the respondent(s), conduct interviews with the child's caretakers concerning the type of services the child is now receiving and the type of services the child needs and visit the child in the caretaker's home, making observations of the child or

b. If the child is in the care of the respondent(s), request from the respondent(s)' attorney interviews with the respondent(s) con-

---

**28.** "The exclusive authority to define, regulate and control the practice of law in West Virginia is vested in the Supreme Court of Appeals." Syl. pt. 1, *State ex rel. Askin v. Dostert,* 170 W.Va. 562, 295 S.E.2d 271 (1982).

cerning the child's care and the type of services the child needs and visit the child in his/her home, making observations of the child. If refused, ask for assistance of the court.

5. Absent extraordinary circumstances and the client is over three:

a. If the child is in the care of someone other than respondent(s), conduct interviews with the child's caretakers concerning the type of services the child is now receiving and the type of services the child needs.

b. If the child is in the care of someone other than the respondent(s), conduct interviews with the child in a manner and environment appropriate to the child's age and maturity to obtain facts concerning the alleged abuse or neglect and to determine the child's wishes and needs regarding temporary visitation and/or placement.

c. If the child is in the care of the respondent(s), request from the respondent(s)' attorney interviews with the child out of the presence of the respondent(s) in a manner and environment appropriate to the child's age and maturity. It is essential that the guardian *ad litem* understand that the interview is for the purpose of gathering information not influencing information. If refused, ask the assistance of the court.

6. Provide to the child, his or her parents, and any caretaker notice of the petition and all subsequent motions.

7. Maintain contact with the child throughout the case and assure that s/he is receiving counseling, tutoring, or any other services needed to provide as much stability and continuity as possible under the circumstances.

### Preparation for and Representation at Adjudicatory and Dispositional Hearing

8. Pursue the discovery of evidence, formal and informal.

9. File timely and appropriate written motions such as motions for status conference, prompt hearing, evidentiary purpose, psychological examination, home study, and development and neurological study.

10. Evaluate any available improvement periods and actively assist in the formulation of an improvement period, where appropriate, and service plans.

11. Monitor the status of the child and progress of the parent(s) in satisfying the conditions of the improvement period by requiring monthly updates or status reports from agencies involved with the family.

12. Participate in any discussions regarding the proposed testimony of the child and, if it is determined that the child's testimony is necessary, strongly advocate for the testimony to be taken in a legally acceptable and emotionally neutral setting.

13. Maintain adequate records of documents filed in the case and of conversations with the client and potential witnesses.

14. Ensure that the child is not exposed to excessive interviews with the potential dangers inherent therein. Before multiple physical or psychological examinations are conducted, the requesting party must present to the judge evidence of a compelling need or reason considering: (1) the nature of the examination requested and the intrusiveness; (2) the victim's age; (3) the resulting physical and/or emotional effects of the examination on the victim; (4) the probative value of the examination to the issue before the court; (5) the remoteness in time of the examination; and (6) the evidence already available for the defendant's use.

15. Ensure that a child who is court ordered to be interviewed by a psychologist or psychiatrist is interviewed in the presence of the guardian *ad litem* attorney unless the court, after consulting the child's guardian *ad litem*, believes that the interview is best conducted without the guardian *ad litem*.

16. Subpoena witnesses for hearings or otherwise prepare testimony or cross-examination of witnesses and ensure that relevant material is introduced.

**42**

17. Review any predispositional report prepared for the court prior to the dispositional hearing and be prepared to submit another if the report is not consistent with all other appropriate evidence.

18. Apprise the court of the child's wishes.

19. Explain to the child, in terms the child can understand, the disposition.

20. Advocate a gradual transition period, in a manner intended to foster emotional adjustment whenever a child is to be removed from the custody of anyone with whom s/he has formed an important attachment.

21. Ensure that the court considers whether continued association with siblings in other placements is in the child's best interests and an appropriate order is entitled to preserve the rights of siblings to continued contact.

22. Ensure that the dispositional order contains provisions that direct the child protective agency to provide periodic reviews and reports.

### Post–Dispositional Representation

23. Inform the child of his/her right to appeal.

24. Exercise the appellate rights of the child, if under the reasonable judgment of the guardian *ad litem,* an appeal is necessary.

25. File a motion for modification of the dispositional order if a change of circumstances occurs for the child which warrants a modification or represent the child if said motion for modification is filed by any other party.

26. Continue to represent the child until such time as the child is adopted, placed in a permanent home, or the case is dismissed after an improvement period.