703 S.E.2d 292 (2010)
STATE of West Virginia ex rel. WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, Petitioner,
v.
The Honorable John C. YODER, Judge of the Circuit Court of Berkeley County, Respondent and
State of West Virginia ex rel. Lawrence Jay A., Infant, Petitioner,
v.
The Honorable John C. Yoder, Judge of the Circuit Court of Berkeley County, Respondent.
Nos. 35693, 35694.
Supreme Court of Appeals of West Virginia.
Submitted October 26, 2010.
Decided November 1, 2010.
*294 Darrell V. McGraw, Jr., Attorney General, Charleston, WV, C. Carter Williams, Assistant Attorney General, Moorefield, WV, for WVDHHR.
Tracy Weese, Esquire, Shepherdstown, WV, Guardian Ad Litem for Lawrence Jay A.
Nancy A. Dalby, Esquire, Charles Town, WV, for Crystal W.
PER CURIAM:
In these consolidated matters, the West Virginia Department of Health and Human Resources (hereinafter DHHR) and the guardian ad litem for Lawrence A.[1], a 19-month-old infant, invoke this Court's original jurisdiction seeking a writ of prohibition to halt the enforcement of two orders entered by the Honorable John C. Yoder, Judge of the Circuit Court of Berkeley County. These two orders direct the DHHR to return custody of Lawrence A. to his mother, Crystal W., and grant her a dispositional improvement period. The petitioners argue that Judge Yoder's findings in these two orders are clearly erroneous and contrary to the evidence presented to the circuit court. The petitioners contend that returning custody of Lawrence to his mother is not in the child's best interest because of her continued association with an individual involved in illegal drug activity. The petitioners also cite numerous instances in which Crystal W. committed perjury while testifying before the circuit court and argue that Judge Yoder committed clear error by relying on her testimony.
*295 After thoroughly reviewing these two matters, we conclude that the two orders issued by Judge Yoder are in excess of the circuit court's jurisdiction and are not in the best interest of Lawrence A. We therefore grant the requested writ of prohibition.

I.

Facts & Background
Lawrence A. was born on January 22, 2009. Three days later, a referral was made to Child Protective Services (hereinafter CPS) after Lawrence tested positive for amphetamines, cocaine and opiates. CPS subsequently interviewed Lawrence's mother, Crystal W., who admitted to smoking crack cocaine and using heroin during her pregnancy. On January 26, 2009, CPS initiated an in-home safety plan requiring Crystal and Lawrence's father, James A., who lived together, to refrain from using illegal drugs, submit to random drug testing, and attend Narcotics Anonymous meetings three times a week.
Approximately two months after entering into the in-home safety plan, James and Crystal tested positive for cocaine. Thereafter, Crystal admitted that she and James used cocaine together and did not attend any Narcotics Anonymous meetings as required by the in-home safety plan. Following the positive drug test and interview with Crystal, the DHHR filed an abuse and neglect petition against Crystal and James, alleging that their child, Lawrence, was in imminent danger due to their continuing drug use. By order entered March 26, 2009, the circuit court removed the child from the family residence and awarded temporary custody to the DHHR. On May 21, 2009, the circuit court found that Crystal and James abused and neglected Lawrence and granted both of them post-adjudicatory improvement periods. These improvement periods required Crystal and James to comply with a number of conditions including:
James A. and Crystal W. may not have contact with anyone involved in illegal activities and he/she may not participate in any illegal activities of any kind during his/her improvement period.
(Emphasis added).
From June through September of 2009, James and Crystal seemingly complied with the terms of their improvement periods. Based on their compliance, the DHHR asked the circuit court to return custody of Lawrence to his parents for a trial reunification period, which Judge Yoder granted by order dated September 28, 2009. Approximately one month after Lawrence was returned to his parents, the Eastern Panhandle Drug and Violent Crimes Task Force executed a raid on James and Crystal's residence, 226 Avondale Road. The task force seized crack cocaine from the residence that was hidden behind a fire alarm in the kitchen, as well as $500 in cash, two flat screen high-definition televisions and a printer. The task force found $300 in a jewelry box that belonged to Crystal. This $300 was identified by serial number as money the task force provided to a confidential informant to make a controlled drug purchase at 226 Avondale Road.
Following the task force raid, James A. was arrested and charged with distributing crack cocaine in violation of W.Va.Code, § 60A-4-401 [2005].[2] After learning about the task force raid at 226 Avondale Road, the DHHR removed Lawrence from the residence and the guardian ad litem filed a motion to revoke Crystal and James' improvement periods. Two weeks after the task force raid, Crystal filed a motion for the return of physical custody of Lawrence, arguing that she had complied with the terms of her improvement period, was unaware that James was engaging in criminal activity in the family residence, and "is no longer living with (James) nor continuing a relationship with him." (Emphasis added). The circuit court held evidentiary hearings on February 18, 2010, and March 24, 2010, to consider the guardian ad litem's motion to revoke Crystal and James' improvement periods and Crystal's motion to return physical custody of Lawrence to her.
*296 At the February 18, 2010, hearing, Crystal testified that she was a recovering crack cocaine addict and had previously sold crack[3], but was unaware of any illegal drug activity that was taking place at her residence in October 2009. She also stated that the $300 that was seized from her jewelry box was money she made from selling promotional candy through her job at Walgreens Pharmacy and offered the following explanation why she was in possession of the marked bills:
I asked James the night before when the door got kicked in to switch me out on the small bills to bigger bills, like I said, my savings. I always want bigger money and not just like twenties and fives and tens.
Crystal testified that she has had no contact with James since the October 30, 2009, task force raid because associating with someone involved in illegal drug activity is "not safe for my son." Crystal was asked a second time whether she had any contact with James since October 30, 2009, and stated that she had not seen or spoken to him at all, other than occasionally seeing him in court, "because after Lawrence was taken again I decided that it would be better off not to have him (James) involved in my life at this moment."
Following Crystal's testimony, the circuit court continued the hearing until March 24, 2010. Crystal was called at the beginning of the March hearing and asked if she wanted to change or clarify any of her testimony from the February hearing. She replied:
Well, now that you bring that up, I guess on March 3rdmy lawyer approached me with some new evidence. On March 3rd James and I were seen at the Roc's Shell in Charles Town I believe. We were resolving some property issues and matters that we had with where his property was going to go, I mean, and some of his dog kennel stuff that he's left at the trailer.
And we were resolving that and he helped me with gas. He ended up there. So we went to the Shell to fill up the tank. I'm finalizing that. Thank you for giving me the opportunity to bring that to light.
Crystal and James were observed at the gas station by Kimberley Crockett, counsel for the DHHR. A video of this meeting was taken[4] and provided to Crystal's attorney prior to the March 24, 2010, hearing. Crystal stated that this gas station meeting was the only time she had seen James since the October 30, 2009, task force raid. She also reiterated the reason she ended her relationship with James was because he was involved in dealing crack cocaine, which she acknowledged is a dangerous and illegal activity.
James A. testified after Crystal and stated that he had been back at 226 Avondale Road on a number of occasions since October 30, 2009. He testified that he went there when Crystal was at work and said that he had a key to the residence until January 2010. When asked about the task force raid on October 30, 2009, and whether he had taken part in illegal drug activity at the family residence, James A. invoked his Fifth Amendment Rights and declined to answer questions relating to the raid and his subsequent arrest.
West Virginia State Trooper Brian Bean, who was a member of the task force that raided 226 Avondale Road on October 30, 2009, testified that Crystal could face a federal charge in connection with the drug activity that occurred at her residence. When asked specifically what charges Crystal could face, Trooper Bean replied:
Aiding and abetting, possibly what's commonly referred to as the crack house statute which is the federal statute that deals with maintaining a residence and allowing controlled substances to be sold from it.[5]
*297 The guardian ad litem next called Deputy Thomas Funk of the Berkeley County Sheriff's Office. Deputy Funk testified that he went to 226 Avondale Road on December 11, 2009, to serve property forfeiture papers on both James and Crystal. James answered the door and accepted service for both he and Crystal. James advised Deputy Funk that Crystal was his girlfriend and that they lived together. This occurred approximately five weeks after the task force raid.
Deputy Funk had another paper to serve on James in January 2010. He again went to 226 Avondale Road and this time Crystal answered the door. Deputy Funk asked Crystal if James was home, she said yes and called to him. James then came to the door and Deputy Funk served him with the papers.
Travis Lutrell was called by the guardian ad litem and testified that he saw Crystal and James together in late January or early February 2010, in a K-Mart parking lot. Mr. Lutrell stated that he got into an argument with Crystal in the parking lot because she blamed Mr. Lutrell for losing custody of Lawrence.[6]
The guardian ad litem next called Jimmy Williams, an investigator for the Berkeley County Prosecuting Attorney's Office. Mr. Williams stated that he conducted surveillance on 226 Avondale Road on February 18, 2010, and on March 24, 2010. On both occasions, he observed Crystal and James leaving the residence in different vehicles, approximately fifteen minutes apart, both traveling to the county courthouse for the hearings in this matter.[7]
Jennifer Foster was the CPS case worker assigned to this case. She testified that the DHHR's official position was that James and Crystal violated the terms of their improvement period. Ms. Foster was asked:
Q. Okay. What concerns do you have about the fact that we've heard testimony from witness after witness that she's (Crystal) continued to have contact with him (James) after learning about this, after the raid occurred?
A. Well, it's very concerning because she's maintained that she wants her child back and yet she's participating in something that could be unsafe by maintaining a relationship, plus she's lied to the Department. So, there's lack of truth and putting herself at risk regarding her own sobriety and interacting with someone who as she said, you know, risked her losing her child for an illegal activity.
Following Ms. Foster's testimony, Crystal was again called to testify and asked about the discrepancies in her testimony. Crystal admitted that she lied to the court at both the February 18th and March 24th hearings. She admitted that she had maintained contact with James after the October 30, 2009, task force raid, explaining that he came to 226 Avondale Road from time to time to check on his pit bull dogs.[8] Crystal admitted that James was at the residence when Mr. Williams came to serve the forfeiture papers *298 in January 2010. Crystal admitted that James was at the residence with her on the morning of February 18, 2010, before the court hearing in this matter, the same hearing in which she denied having seen James at all since the October 30, 2009, task force raid. When asked about being seen at the gas station, counsel asked Crystal:
Q. The reason you did that (admitted you met with James there) is that Ms. Crockett caught you and we have a video, is that true?
A. Is it? I think it might be true.
Q. So you don't tell the truth do you?
A. I haven't been completely honest, no.
Crystal also initially denied that she had seen Travis Lutrell in the K-Mart parking lot, but later confirmed that she did see him and that she did get into an argument with him there.
At the conclusion of the March 24, 2010, hearing, Judge Yoder asked the parties to submit proposed findings of facts and conclusions of law. By order dated June 18, 2010, Judge Yoder denied the guardian ad litem's motion to revoke Crystal's improvement period and granted Crystal's motion to return custody of Lawrence to her. The DHHR filed a motion to reconsider and reverse this order, which Judge Yoder denied on July 22, 2010. The circuit court subsequently entered an order, on July 27, 2010, granting Crystal a dispositional improvement period over the objection of the DHHR and the guardian ad litem.
On August 12, 2010, the DHHR and Lawrence A.'s guardian ad litem filed separate petitions for writs of prohibition with this Court, seeking to halt enforcement of the June 18, 2010, and July 27, 2010, orders from the circuit court. The petitions requested that we issue a rule to show cause against Judge Yoder. On September 22, 2010, we entered an order commanding the respondents to show cause why a writ of prohibition should not be awarded against Judge Yoder.

II.

Standard of Review
"The writ of prohibition will issue only in clear cases, where the inferior tribunal is proceeding without, or in excess of, jurisdiction." Syllabus, State ex rel. Vineyard v. O'Brien, 100 W.Va. 163, 130 S.E. 111 (1925). See also Syllabus Point 1, Crawford v. Taylor, 138 W.Va. 207, 75 S.E.2d 370 (1953) ("Prohibition lies only to restrain inferior courts from proceeding in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers and may not be used as a substitute for writ of error, appeal or certiorari."); Syllabus Point 2, State ex rel. Peacher v. Sencindiver, 160 W.Va. 314, 233 S.E.2d 425 (1977) ("A writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court. It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. W.Va.Code 53-1-1.").
In Syllabus Point 4 of State ex rel. Hoover v. Berger, 199 W.Va. 12, 483 S.E.2d 12 (1996), we set forth the following standard for issuance of a writ of prohibition when it is alleged a lower court is exceeding its authority:
In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear *299 error as a matter of law, should be given substantial weight.
With this standard in mind, we turn to the parties' arguments.

III.

Discussion
The guardian ad litem and the DHHR argue that the circuit court's orders denying the motion to revoke Crystal's improvement period and granting the order returning custody of Lawrence to Crystal are in excess of the circuit court's jurisdiction based upon the evidence presented at the February 18, 2010, and March 24, 2010, hearings.
In this case, as with all abuse and neglect proceedings, "the best interests of the child is the polar star by which decisions must be made which affect children." Michael K.T. v. Tina L.T., 182 W.Va. 399, 405, 387 S.E.2d 866, 872 (1989) (citation omitted). This Court has repeatedly stated that "[a]lthough parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syllabus Point 3, In re Katie S., 198 W.Va. 79, 479 S.E.2d 589 (1996).
In the case sub judice, the petitioners contend that the circuit court should have revoked Crystal's improvement period. This Court has explained that "an improvement period in the context of abuse and neglect proceedings is viewed as an opportunity for the miscreant parent to modify his/her behavior so as to correct the conditions of abuse and/or neglect with which he/she has been charged." In re Emily, 208 W.Va. 325, 334, 540 S.E.2d 542, 551 (2000). In Syllabus Point 6 of In the Interest of Carlita B., 185 W.Va. 613, 408 S.E.2d 365 (1991), we provided direction on how a court should assess a parent's compliance with an improvement period, stating:
At the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child.
In his June 18, 2010, order, Judge Yoder stated that the court did not "look favorably" upon Crystal's "lack of candor and willingness to be forthcoming with information regarding her contact" with James. Judge Yoder determined, however, that Crystal did not lack credibility on all matters. The order goes on to state:
That (Crystal's) contact with (James), while ill-advised, did not violate the terms of her improvement period, as there was no written provision forbidding contact with (James). Further the Court recognizes that some contact with (James) may have been necessary to divide up communal property and relocate (James') business from the home.
This finding is clearly erroneous. Crystal's motion to return custody of Lawrence to her was based in large part on her contention that following the drug raid, she was "no longer living with (James) nor continuing a relationship with him." (Emphasis added). Crystal testified that she ended her relationship with James following the drug raid because associating with someone involved in illegal drug activity is "not safe for my son." It is undisputed that following the October 30, 2009, drug raid, Crystal was aware that James was involved in illegal drug activity.[9] Crystal's improvement period requires that she "may not have contact with anyone involved in illegal activities." Therefore, if Crystal had contact with James after October 30, 2009, when she was aware that he was involved in illegal activity, she violated the terms of her improvement period.
*300 As discussed at length above, the evidence presented at the March 24, 2010, hearing overwhelmingly supports the DHHR and guardian ad litem's contention that Crystal continued to have a relationship with James after October 30, 2009. James testified that he went to 226 Avondale Road on multiple occasions following the task force raid and that he had a key to the residence until January 2010. Deputy Funk served papers at 226 Avondale Road in December 2009 and January 2010, and James was at the residence on both occasions. Investigator Jimmy Williams observed James and Crystal together at the residence on the mornings of February 18, 2010, and March 24, 2010. On both occasions, they drove to the courthouse in separate vehicles in an apparent attempt to maintain the appearance that their relationship was over. James and Crystal were also seen together in late January or early February 2010 at a K-Mart parking lot and on March 3, 2010, at a gas station.
This evidence clearly shows that Crystal continued to maintain a relationship with James after the October 30, 2009, task force raid, even though she admitted that maintaining this relationship would be "unsafe for my son." These multiple contacts between Crystal and James far exceeded the minimal contact that would have been necessary to divide up their communal property, and we find it difficult to understand how Judge Yoder arrived at that conclusion.
Consistent with our principle that "the best interests of the child is the polar star by which decisions must be made which affect children," we granted the guardian ad litem's motion to supplement the file and will consider matters that have occurred since Judge Yoder issued his June 18, 2010, and July 27, 2010, orders. One such matter was an August 10, 2010, property forfeiture hearing in the Circuit Court of Berkeley County before the Honorable Gina M. Groh.[10] At this hearing, Crystal was asked whether she continued living with James after the task force raid and she stated, "Yes, we did. Yes, I did. But I didwe are no longer together and I live with my grandfather." Crystal testified that she has lived with her grandfather since June 2010, and was then asked:
Q. Okay. And so until that time, were you residing at the Avondale residence?
A. Yes, I was. I was on a lease and so was he (James).
Q. Okay. So the two of you continued to reside together until June (2010) at the Avondale residence?
A. Yes.
While there was overwhelming evidence presented at the March 2010 hearing that Crystal continued to maintain a relationship with James after October 30, 2009, the above testimony removes any doubt on this issue. We are confident that had Judge Yoder heard this testimonythat Crystal not only maintained a relationship with James, but continued living with him for eight months following the task force raidhe would not have ordered custody of Lawrence returned to Crystal and he would have granted the motion to revoke her improvement period.
Based on all of the foregoing, Judge Yoder's finding that Crystal's contact with James did not violate the terms of her improvement period is clearly erroneous. We find that granting a writ of prohibition to halt enforcement of Judge Yoder's June 18, 2010, and July 27, 2010, orders is necessary to protect Lawrence from imminent danger.

IV.

Conclusion
Crystal continued living with James for eight months after he was arrested and charged with selling crack cocaine out of the residence where their infant son lived. Crystal testified that continuing a relationship with James would be unsafe for her son. We agree with her and accordingly issue the requested writ of prohibition halting the enforcement of Judge Yoder's June 18, 2010, and July 27, 2010, orders returning custody *301 of Lawrence to Crystal and granting her a dispositional improvement period. We further direct Judge Yoder to enter an order granting the DHHR and guardian ad litem's proposed order revoking Crystal's improvement period.
Because the circuit court exceeded its jurisdiction and did not act in the best interest of the child, this writ of prohibition is warranted.
Writ Granted.
NOTES
[1] We adhere to our usual practice in cases involving sensitive facts and refer to the parties by their first names and last initials only. See In re Clifford K., 217 W.Va. 625, 619 S.E.2d 138 (2005).
[2] These charges were subsequently dismissed in anticipation of federal drug charges being brought against him.
[3] And tell us why you're familiar with crack cocaine?
A. Because I am a recovering addict.
Q. And isn't it true you also sold crack cocaine?
A. Yeah, but I never got charged for that. I got chargedI pled guilty to possession of a controlled substance.
[4] The record does not state who recorded the video.
[5] Crystal has not been charged with these crimes in connection with the October 30, 2009, task force raid.
[6] At an August 10, 2010, forfeiture hearing, West Virginia State Trooper Brian Bean testified that Travis Lutrell was the confidential informant who made the drug purchase from James at 226 Avondale Road on October 30, 2009. During cross-examination at the March 24, 2010, hearing, Mr. Lutrell stated that he was convicted for drug possession in February 2010 and that he was currently taking methadone.
[7] During cross-examination, there was some question as to whether Mr. Williams could positively identify James A. as the man who exited 226 Avondale Road on February 18, 2010. Mr. Williams stated that the African-American male who exited 226 Avondale Road was wearing the same clothes that James A. had on in court that morning. The guardian ad litem asked Mr. Williams:

Q. Okay. And you feel fairly certain, well, you've testified so I assume you are certain that the gentleman that you saw on February 18th leave the house, come in here to the van, come into the courtroom was the same gentleman from point A at Avondale Road to the courthouse, correct?
A. Yes.
Q. Okay. Do you have any doubt that it's James A. this morning (March 24, 2010)? You've testified about him wearing the same clothes?
A. Same clothing, the same, you know.
Q. So you're sure that it's James A. today?
A. Yes.
[8] James A. operated a pit bull kennel at 226 Avondale Road.
[9] At the February 18, 2010, hearing, Crystal testified as follows:

Q. And what part of the relationship with Mr. A.'s not safe?
A. Whatever is illegal that's going on. I mean, anything illegal.
Q. And is it your understanding that illegal activity is drug dealing?
A. Drug dealing is illegal.
Q. And is it your understanding that's what he's alleged to have been involved in?
A. Yes.
[10] Crystal filed a motion to have the $300, two high-definition televisions and printer that the task force seized during the October 30, 2009, raid at 226 Avondale Road returned to her. Judge Groh found that all of these items were gained from illegal drug transactions and were therefore forfeited into the State's possession.