except as otherwise provided in these rules." There no longer needs to be an exception for the Dead Man's Statute.

2. A new rule should be added to the hearsay exceptions, one similar to New Hampshire's Rule of Evidence 804(b)(5) and California's Evidence Code § 1261. The new hearsay rule would state:

> In actions, suits or proceedings by or against the representatives of deceased persons, including proceedings for the probate of wills, any statement of the deceased, whether written or oral, shall not be excluded as hearsay provided the Trial Judge shall first find as a fact that the statement was made by the decedent, that it was made in good faith and on the decedent's personal knowledge, and the statement was made under circumstances such as to indicate it was trustworthy.[1]

In the meantime, judges should assess the admissibility of such evidence under the above guidelines and the "catch-all" provision of Rule 804(b)(5).[2]

743 S.E.2d 919

### In re WALTER G.

### No. 12–0973.

Supreme Court of Appeals of West Virginia.

Submitted April 17, 2013.

Decided May 23, 2013.

---

Cheryl L. Warman, Esq., Morgantown, WV, Attorney for Petitioner.

Patrick Morrisey, Esq., Attorney General, Charleston, WV, Lee A. Niezgoda, Esq., As-

sistant Attorney General, White Hall, WV, Attorney for Respondent.

Chaelyn W. Casteel, Esq., Kingwood, WV, Guardian Ad Litem for Walter G.

PER CURIAM:

This matter is before this Court upon the appeal of an Adjudicatory Hearing Order of the Circuit Court of Preston County, West Virginia, entered on July 19, 2012, finding that the petitioner and respondent below, Brittany S.,[1] neglected her twin infant children, Walter G. and Joseph G., by failing to provide them with appropriate supervision on January 26–27, 2012, leading to the death of Joseph G. Following a six-day adjudicatory hearing, the circuit court concluded that the surviving twin, Walter G., is a neglected child and that it is contrary to his welfare to reside with the petitioner in her home. On appeal, the petitioner contends that the circuit court committed error in its adjudicatory finding that Walter G. was a neglected child.[2]

## I. Factual and Procedural Background

The following relevant facts, which were elicited during the course of the adjudicatory hearing in this matter, are, for the most part, not in dispute. The petitioner, Brittany S., is the biological mother of twins Joseph G. and Walter G., who were born on February 5, 2011. At all times relevant, the twins resided with the petitioner and her boyfriend, Tony A., at the petitioner's home in Preston County. Also residing in the home were the petitioner's brother, Joshua S., and his girlfriend, Brandy H.

The petitioner is a certified nursing assistant employed full time at a nursing home located approximately fifteen minutes from her home. She regularly works a 3:00 p.m. to 11:00 p.m. shift. On January 26, 2012, Tony A.'s father and sister watched the twins beginning at 2:30 p.m.[3] During the course of the afternoon, several other members of Tony A.'s family arrived at the petitioner's home, where they prepared and ate dinner and fed the twins. It is undisputed that the children spent most of the afternoon playing in the living room area, which was set off from the rest of the house by baby gates.

Tony A. arrived home from work at approximately 5:00 p.m. By 6:00 p.m., Tony A. and the twins were there alone. The petitioner testified that Tony A. always took good care of them. Tony A. testified that, other than preparing their bottles in the kitchen, he watched the twins in the living room the entire evening while he sat in a recliner and watched television. He further testified that while he fed Walter his bottle at approximately 10:30 p.m., Joseph pushed a bag of baby wipes around on the floor and, at one point, fell asleep. Tony A. testified that he did not find this to be unusual because, prior to that evening, Joseph had been falling asleep in his "bouncer." Joseph awakened and Tony A. fed him a bottle between 10:30 p.m. and 10:45 p.m. Because they had stuffy noses and some congestion, he administered .2 cc of Benadryl to each of them.[4] He then put the children to bed, each in his own crib.

---

**1.** We follow our traditional practice in child abuse and neglect matters and other cases involving sensitive facts and refer to the parties by their first names and last initials only. *See State ex rel. W.Va. Dept. of Human Resources v. Yoder,* 226 W.Va. 520, 522 n. 1, 703 S.E.2d 292, 294 n. 1 (2010); *In the Interest of Tiffany Marie S.,* 196 W.Va. 223, 226 n. 1, 470 S.E.2d 177, 180 n. 1 (1996).

**2.** On appeal, the petitioner also sought the immediate legal and physical custody of Walter G. and the implementation of a parenting plan between her and the child's biological father. The biological father is not a party to the instant appeal.

On April 8, 2013, pursuant to Rule 11(j) of the West Virginia Rules of Appellate Procedure, the guardian *ad litem* filed an update on both the status of Walter G. and the instant abuse and neglect proceeding, indicating that the petitioner

successfully completed her post-adjudicatory improvement period and that Walter G. was returned to her legal and physical custody. The petitioner and the biological father also executed a parenting plan which provided for frequent and regular visitation between the minor child and his father. The abuse and neglect proceeding against the petitioner was dismissed. Therefore, the only issue before this Court is whether the circuit court erred in adjudicating Walter G. a neglected child.

**3.** Ordinarily, the petitioner's mother, Kathy S., babysat the twins while the petitioner was at work; however, Kathy S. was unable to babysit that day due to her own work schedule.

**4.** The twins' pediatrician, Dr. Elizabeth J. Neely, testified that they received their first set of flu shots on December 9, 2011. When they were

When the petitioner arrived home at 11:15 p.m., the twins were already asleep. The petitioner testified that she sat in the living room and asked Tony about the boys. According to the petitioner, "nothing he told me was unusual for that night." Although Tony mentioned to her that Joseph had fallen asleep on the floor, the petitioner testified that she did not find it to be unusual because the twins had previously begun to fall asleep on their own. It is undisputed that the petitioner did not check on the twins before she and Tony went to bed at approximately 11:30 p.m.[5] The petitioner testified that if the children were already asleep in their cribs when she arrived home from work, she usually did not enter their bedroom to check on them because if one of them were to awaken, it would cause the other one to awaken, too.

The following morning, Walter awakened between 9:00 a.m. and 9:15 a.m., at which time Tony A. took him out of his crib. When the petitioner went into the twins' room to then check on Joseph, she saw that his face was blue and his body was stiff. When the petitioner screamed for help, someone in the home called 911; the petitioner's mother, Kathy S., was also called because she is a nurse and lives just across the field from petitioner's home. Kathy S. attempted to revive Joseph until emergency medical personnel arrived; however, he was already dead.

According to the testimony of Dawn Spears, Preston County Medical Examiner/Coroner, who arrived at the petitioner's home the morning of Joseph's death after being notified by Preston County 911, she observed vomit on the bedding in Joseph's crib. In an Unexplained Infant/Early Childhood Death Investigation Report prepared by Ms. Spears in connection with her investigation of Joseph's death, she reported that the vomit contained two pieces of what appeared to be "black vinyl" matching the material of the sofa in the living room of the home.[6]

Approximately one month later, toxicology tests determined that Joseph's cause of death was the ingestion of buprenorphine,[7] also known by the proprietary name of Suboxone, with diphenhydramine (Benadryl) adding to

seen on December 12, 2011, for their nine-month check-up, they were suffering from ear infections and upper respiratory symptoms and were prescribed antibiotics. She retreated their ear infections on January 18, 2012, noting they still had some coughing and nasal drainage. On January 25, 2012, two days before Joseph's death, the twins' eyes, ears and lungs were sufficiently clear to be given their second flu shot. Dr. Neely testified that congestion and cough can linger after an infection clears and that her notes indicated that Joseph continued to have a "little bit of a stuffy nose at that point" and that both children were teething. She testified that although she did not make a written notation prescribing Benadryl, she indicated that she routinely recommends it for coughs and nasal congestion. Dr. Neely further testified that "loose coughs show up at night ... [s]o if there had been some residual loose cough it wouldn't have been inappropriate to give the Benadryl at bedtime." In addition to Benadryl, the petitioner ran a humidifier in the twins' bedroom to help alleviate their symptoms. Finally, Dr. Neely testified that she had no concerns about the quality of care the petitioner gave the twins. To the contrary, she stated they were "[v]ery well cared for[;] [v]ery happy[;] [v]ery happy children" and that the petitioner was fully involved in their treatment and care.

5. Joshua S., the petitioner's brother, and Brandy H., his girlfriend, who had gone out for the evening, arrived home shortly thereafter. They also went to bed at approximately 11:30 p.m.

6. The petitioner had a black imitation leather sofa in her living room, which was given to her and Tony A. by his father. The petitioner testified that the sofa had rips in it when they got it and that, over time, the rips had gotten larger from use and that pieces of the sofa would sometimes fall to the ground. Both she and Tony testified that the twins would sometimes put things in their mouths that they picked up off the floor. The petitioner further testified that she tried to keep the sofa covered in blankets to keep the twins from picking at it.

7. Buprenorphine is available in sublingual dissolvable pill form, which is orange in color and, according to Dr. Hamada Mahmoud, Deputy Chief Medical Examiner in the West Virginia Office of the Chief Medical Examiner, a child could easily mistake it for candy. Buprenorphine is also available in a transdermal patch, as an injection (for children), and in the form of a film which dissolves on the tongue. Dr. James Kraner, Chief Toxicologist in the Chief Medical Examiner's office, testified that it was difficult to determine how much of the drug the child ingested but that a single two milligram tablet could have produced the level found in Joseph's body upon death.

its adverse effects.[8] Buprenorphine is an opiate derivative prescribed to treat drug addiction and is sometimes prescribed for pain. It is also known to be abused as a street drug. Dr. Hamada Mahmoud, Deputy Chief Medical Examiner of the West Virginia Office of the Chief Medical Examiner, testified that the time of Joseph's death was estimated at approximately 7:00 a.m. on January 27, 2012, with ingestion of the buprenorphine occurring between 6:00 p.m. and midnight the previous evening.

It is undisputed that neither Joseph nor Walter had a prescription for buprenorphine. It is further undisputed that the petitioner did not have a prescription for this drug nor was there any evidence that she ever abused it or any other prescription drug. After the toxicology report was issued, the petitioner underwent a court-ordered drug screen, which was negative for buprenorphine as well as for all of the other substances for which she was screened. According to Tina Krentz, the petitioner's supervisor at the nursing home where she worked, the petitioner's mandatory pre-employment drug screen was negative.[9]

The petitioner testified that she was shocked to learn that Joseph's cause of death was the lethal ingestion of buprenorphine. She further testified that she did not know anyone who used the drug and had no information as to how the drug would have been accessible to her children. It is undisputed that she was very cooperative with the police and Child Protective Services ("CPS") investigations into Joseph's death. According to CPS worker Lawrence Taylor, CPS had no prior referrals or reports involving the petitioner or her family. Mr. Taylor testified that there was no indication that the petitioner has a drug problem and that, in this case, the department was exclusively concerned with where the buprenorphine originated and that it "could ... have something to do with the caretakers" of the twins.

Furthermore, there was no evidence that any of the other people then living in the petitioner's home—Tony A., Joshua S. (the petitioner's brother) and Brandy H.[10] (Joshua's girlfriend)—had a prescription for buprenorphine or otherwise abused it. Similarly, there was no evidence that any of the other people at the petitioner's home on the day preceding Joseph's G.'s death were either using or abusing buprenorphine or any other drug.

During the course of the investigation,[11] it was learned that, one to two years prior to Joseph's death, Tina C., Tony A.'s sister who, along with Tony A.'s father, babysat the twins the day before Joseph's death, had a prescription for Suboxone. However, she told investigators that she had stopped taking it because it made her ill.[12] The petitioner testified that she was unaware that Tina C. ever had a prescription for Suboxone and was further unaware of the reasons for which it was prescribed until after the toxicology report in this matter was disclosed. Ultimately, neither the investigations by law enforcement and CPS nor the petitioner's own

---

8. Dr. Kraner testified that although diphenhydramine (Benadryl) is an accepted medication for children of Joseph's age, it had an adverse additive effect in this case when ingested with the buprenorphine, causing Joseph to stop breathing.

9. The petitioner began employment at the nursing home on May 4, 2011. Ms. Krentz testified that additional drug testing is conducted on employees only when there is a suspicion that there is a substance abuse problem. She further testified that the petitioner has never been required to undergo additional drug testing. According to Ms. Krentz's testimony, the petitioner does not have access to drugs at the nursing home and buprenorphine is not used by any of the residents there. Ms. Krentz indicated that the petitioner is an excellent employee who is well liked by the nursing home residents.

10. Like the petitioner, Brandy H. was a certified nursing assistant and was employed at the same nursing home where the petitioner worked. Her employment supervisor, Ms. Krentz, testified that Brandy's pre-employment drug screen was negative. Ms. Krentz further testified that she had never seen Brandy under the influence of drugs.

11. It is undisputed that everyone who was present at the petitioner's home on January 26, 2012, was very cooperative with the police and CPS investigations into Joseph's death.

12. Tina C. was prescribed Suboxone after she had attempted suicide. She was prescribed the drug in the dissolvable strip form. There is no evidence that Tina C. had a prescription for Suboxone at the time of Joseph's death, or that she was otherwise illegally abusing the drug.

inquiries into Joseph's death were able to determine how Joseph ingested the drug or where it originated.

On February 28, 2012, the West Virginia Department of Health and Human Resources ("DHHR") filed an Imminent Danger Petition pursuant to West Virginia Code § 49-6-1, et seq., alleging that Walter G. was a "neglected and/or abused child" based upon the death of Joseph G. resulting from a "lethal ingestion of Suboxone." The circuit court ordered immediate transfer of the legal and physical custody of the child to the DHHR pending a preliminary hearing. Walter G. was placed with his maternal grandparents. On March 7, 2012, the petitioner waived her right to a preliminary hearing and the circuit court found that the best interests of Walter G. would be served by remaining in the temporary custody of the DHHR with continued placement in the home of the maternal grandparents. The petitioner was granted liberal visitation. It is noted that during the pendency of the abuse and neglect proceedings against the petitioner, Tony A., Joshua S., and Brandy H. all moved out of the petitioner's home.

At a hearing conducted on April 27, 2012, the circuit court denied the petitioner's motion for a three-month pre-adjudicatory improvement period. As previously indicated, adjudicatory proceedings were conducted over a course of six days during which the facts set forth above were elicited.[13] In an Adjudicatory Hearing Order entered July 19, 2012, the circuit court found that the petitioner "neglected her twin infant children, including Walter [G.], by failing to provide them with appropriate supervision on January 26–27, 2012, leading to the death of Joseph [G.], and posing an imminent danger to the health and/or well-being of his surviving twin, Walter [G.]." The circuit court concluded that the death of Joseph G. "was a result of a non-accidental oral ingestion of buprenorphine (Suboxone) as combined with diphenhydramine (Benadryl)" and that

> the failure of the [petitioner] or anyone to check on the children[14] and the [petitioner's] failure to have a responsible caregiver constitutes neglect to provide appropriate supervision when taken in the context of the uncontroverted testimony that the children were ill, had just received their second flu shot the day before, were being administered Benadryl, and that Joseph had fallen asleep while playing, which was an unusual event for him. The Court also notes and FINDS that the presence of black material in Joseph's vomit is believed by the parties to have been from the peeling, cracked naugahyde couch in the living room, supports the conclusion that inadequate supervision was provided on January 26, 2012, because the parties conceded, in all probability, that Joseph consumed pieces of the naugahyde while being watched by [Tony A.]. The Court further FINDS the death of Joseph unexplained, but according to the medical examiner, due to the oral ingestion of buprenorphine, which was accessible to the children on January 26, 2012.

(footnote added). It is from this order that the petitioner now appeals.

## II. Standard of Review

 This Court has stated that "'[f]or appeals resulting from abuse and neglect proceedings, such as the case *sub judice*, we employ a compound standard of review: conclusions of law are subject to a *de novo*

---

**13.** During the course of the adjudicatory proceedings, the prosecuting attorney moved to withdraw as counsel for the DHHR based upon his belief that there was not enough evidence to go forward. The prosecuting attorney's position was in conflict with that of his client, the DHHR, which sought to pursue the matter. Ultimately, the circuit court denied the motion to withdraw and ordered the prosecuting attorney to continue to represent the DHHR pursuant to *In re Ashton M.*, 228 W.Va. 584, 723 S.E.2d 409 (2012) (holding that in civil abuse and neglect proceedings, DHHR is client of county prosecutors and prosecutor had duty to represent DHHR's recommen-

dation of termination of custodial and parental rights).

**14.** The circuit court emphasized that after Tony gave the twins Benadryl and put them to bed, *"he did not check on them for the remainder of the night."* The circuit court further emphasized that the petitioner *"returned home from work at approximately 11:15 p.m., but she testified that she did not check on the twins* until awakened by the surviving twin, Walter, at approximately 9:30 a.m. the next morning."

review, while findings of fact are weighed against a clearly erroneous standard.' *In re Emily,* 208 W.Va. 325, 332, 540 S.E.2d 542, 549 (2000)." *In re Gordon G.,* 216 W.Va. 33, 36, 602 S.E.2d 476, 479 (2004). Additionally, in syllabus point one of *In the Interest of: Tiffany Marie S.,* 196 W.Va. 223, 225–26, 470 S.E.2d 177, 179–80 (1996), this Court held the following:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

*See Gordon G.,* 216 W.Va. at 36, 602 S.E.2d at 479. We now apply this standard of review to the case *sub judice.*

## III. Discussion

### A. Non–Accidental Ingestion

■ At the outset, we address the circuit court's conclusion that Joseph's death "was a result of a *non-accidental* oral ingestion of buprenorphine (Suboxone) as combined with diphenhydramine (Benadryl)." (Emphasis added). We find this conclusion—which clearly suggests that Joseph's ingestion of the drug was intentional—to be contrary to the evidence. In fact, there was no evidence whatsoever presented below that even remotely suggested that the ingestion was intentional. Moreover, during oral argument, the DHHR conceded that the facts herein do not support such a conclusion and surmised that, in all likelihood, the circuit court mis-

takenly included this finding in its order. Be that as it may, we are mindful that "[i]t is a paramount principle of jurisprudence that a court speaks only through its orders." *Legg v. Felinton,* 219 W.Va. 478, 483, 637 S.E.2d 576, 581 (2006). *See State v. White,* 188 W.Va. 534, 536 n. 2, 425 S.E.2d 210, 212 n. 2 (1992) ("[H]aving held that a court speaks through its orders, we are left to decide this case within the parameters of the circuit court's order." (citations omitted)); *State ex rel. Erlewine v. Thompson,* 156 W.Va. 714, 718, 207 S.E.2d 105, 107 (1973) ("A court of record speaks only through its orders[.]" (citations omitted)). Accordingly, this Court concludes that, given the facts of this case, the circuit court clearly erred in its conclusion that Joseph's death was caused by a non-accidental ingestion of buprenorphine.

### B. Appropriate Supervision

Next, we address the primary issue in this appeal: Whether the circuit court clearly erred in concluding that the petitioner neglected her children, including Walter G., by failing to provide appropriate supervision on January 26–27, 2012.

West Virginia Code § 49–1–3(11)(A) (2009) (Supp.2012) defines a "neglected child" as a child:

> (i) Whose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent, guardian or custodian to supply the child with necessary food, clothing, shelter, supervision, medical care or education, when such refusal, failure or inability is not due primarily to a lack of financial means on the part of the parent, guardian or custodian; or
> (ii) Who is presently without necessary food, clothing, shelter, medical care, education or supervision because of the disappearance or absence of the child's parent or custodian[.]

The petitioner argues that the circuit court's factual findings do not support its conclusion that she neglected her children on January 26–27, 2012, by failing to have a responsible caregiver for them and by failing to check on them after she returned home from work.

The petitioner further contends that her conduct did not constitute a lack of proper supervision which warranted a finding that Walter G. is a "neglected child" as that term is defined by West Virginia Code § 49–1–3(11)(A). However, the DHHR and the guardian *ad litem* contend that the circuit court did not err in finding that Walter G. was a neglected child by virtue of the petitioner's failure to supervise. At issue, therefore, is whether there was sufficient proof leading to the circuit court's conclusion that the petitioner neglected her child, Walter G.

This Court has previously held as follows:

> "W.Va.Code, 49–6–2(c) [1980], requires the State Department of Welfare [now the Department of Health and Human Resources], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition . . . by clear and convincing proof.'" Syllabus point 1, [in part], *In the Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981).

Syl. Pt. 2, in part, *In re Bryanna H.*, 225 W.Va. 659, 661, 695 S.E.2d 889, 891 (2010). As indicated above, the circuit court concluded, in relevant part, that

> [t]he failure of the [petitioner] or anyone to check on the children and the [petitioner's] failure to have a responsible caregiver constitutes neglect to provide appropriate supervision when taken in the context of the uncontroverted testimony that the children were ill, had just received their second flu shot the day before, were being administered Benadryl, and that Joseph had fallen asleep while playing, which was an unusual event for him.

Based upon our appellate review of all of the evidence, this Court is of the opinion that the circuit court's adjudicatory finding of neglect was not based upon clear and convincing evidence and was, therefore, clearly erroneous. *See Tiffany Marie S.*, 196 W.Va. at 225–26, 470 S.E.2d at 179–80, syl. pt. 1. The adjudicatory hearing transcript indicates that, contrary to the circuit court's conclusion that it was "an unusual event" for Joseph to have fallen asleep on the floor, both the petitioner and Tony A. testified that, in fact, they were *not* concerned because the boys had previously begun falling asleep on their own. The petitioner specifically testified that "nothing [Tony] told me was unusual for that night." Furthermore, although the children had previously been ill, Dr. Neely testified that their eyes, ears, and lungs were sufficiently clear to be able to receive their flu shots on January 25, 2012. There was no evidence that the shots caused the twins to suffer any ill effects or that their lingering coughs and stuffy noses were of particular concern.

The evidence further established that, prior to and including the date of Joseph's death, the petitioner was an attentive mother who was fully committed to the welfare of her children. The twins' pediatrician, Dr. Neely, testified that the petitioner brought them in for regular medical check-ups and vaccinations and sought medical attention for them when they were ill. In her objective opinion, the petitioner was a very involved mother and that the children appeared to be happy and well cared for.[15]

Additional evidence adduced during the adjudicatory proceedings demonstrated that Tony A. routinely watched the children after he arrived home from work at 5:00 p.m. and that, prior to Joseph's death, the petitioner had no reason to believe that he was not an appropriate caregiver. Indeed, she testified that he always took good care of the children. Importantly, the DHHR offered no evidence to the contrary.

With regard to the hours preceding Joseph's death, the evidence showed that on January 26, 2012, after everyone left the home at approximately 6:00 p.m., Tony A. attended to the twins in the living room the entire evening. He admitted to leaving them alone briefly to make their bottles in the kitchen. He testified that he fed Joseph a bottle between 10:30 p.m. and 10:45 p.m. He also administered Benadryl to each child in the appropriate dosage for treatment of their lingering stuffy noses and congestion. Tony A. put the twins to bed and they were asleep

---

**15.** Furthermore, the petitioner's supervisor at the nursing home where the petitioner is employed testified that she is an excellent employee who is well liked by the residents.

before the petitioner arrived home from work shortly thereafter, at approximately 11:15 p.m.

When the petitioner arrived home from work, she asked Tony A. about the boys and, as indicated above, he told her that nothing unusual had occurred. Although she did not check on the twins before going to bed at 11:30 p.m. (less than one hour after Tony A. had placed them in their cribs), there is no medical evidence that if she had checked on Joseph, that it would have prevented his death, which, according to expert medical testimony, did not occur until approximately 7:00 a.m. the following morning. The petitioner testified that, as a matter of course, if the twins were already asleep in their cribs when she arrived home from work, she did not enter their bedroom to check on them because if one of them were to awaken, it would cause the other one to awaken, too.

This Court is mindful that Joseph's death was caused by the lethal ingestion of a narcotic, the source of which has never been uncovered. There was no evidence, however, that either the petitioner or Tony A. used or had access to buprenorphine or that the petitioner had reason to believe that anyone living in or visiting her home on January 26, 2012, was either using or abusing it.[16] Investigations by police and CPS, and the petitioner's own inquiries into where the drug originated and how Joseph was able to ingest it, were unsuccessful. It is clear, therefore, that the petitioner could not have foreseen that her children would either have access to or accidentally ingest buprenorphine while under Tony A.'s care or at anytime.

In consideration of all of the above, this Court finds that the circuit court clearly erred in concluding that Walter G. was a neglected child. In so holding, we are cognizant that "[a]lthough parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect ... must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W.Va. 79, 82, 479 S.E.2d 589, 592 (1996). Indeed, " '[t]he best interests of the child is the polar star by which decisions must be made which affect children.' *Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 405, 387 S.E.2d 866, 872 (1989) (citation omitted)." *In re Isaiah A.*, 228 W.Va. 176, 182, 718 S.E.2d 775, 781 (2010). See *In re Amber Leigh J.*, 216 W.Va. 266, 272, 607 S.E.2d 372, 378 (2004) ("Of course, [in abuse and neglect cases] the best interests of the child are paramount." (internal quotations and citation omitted)). In this case, the circuit court, the DHHR, and the guardian *ad litem* clearly endeavored to protect the health, safety, and welfare of Walter G. following the death of his brother, Joseph G., by instituting the instant proceedings. In removing Walter from the home and granting the petitioner an improvement period, the circuit court was then able to evaluate the petitioner's fitness as a parent. Ultimately, the circuit court correctly reunified Walter with his mother and dismissed the abuse and neglect proceedings against her. However, in reviewing the entire record on appeal, this Court concludes that there was no clear and convincing evidence to support the circuit court's adjudicatory finding of neglect in the first instance.[17]

---

16. As previously established, the petitioner learned *after* the toxicology report was disclosed that Tina C., Tony A.'s sister, had been prescribed Suboxone one to two years earlier. According to the police investigation and the petitioner's own inquiries, Tina C. stopped taking the medication because it made her ill. There was no evidence that Tina C. was using buprenorphine at the time of Joseph's death.

17. Finally, we note that the Adjudicatory Hearing Order refers to *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993), and several of its progeny, which held that parental rights may be terminated where there is clear and convincing evidence of physical abuse of a child while in the custody of a parent and where it is unlikely the

conditions of abuse can be corrected "because the perpetrator of the abuse has not been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser." 190 W.Va. at 25–26, 435 S.E.2d at 163–64, syl. pt. 3, in part. See also *In re Kaitlyn P.*, 225 W.Va. 123, 127, 690 S.E.2d 131, 135 (2010); Syl. Pt. 2, *In re Danielle T.*, 195 W.Va. 530–31, 466 S.E.2d 189–90 (1995). Our review of the circuit court's order clearly indicates that the court referred to these cases only to the extent that the DHHR relied on them in support of its position below and that its finding of neglect was not based upon the failure to identify the source of the buprenorphine.

## IV. Conclusion

For the reasons stated herein, the Adjudicatory Hearing Order entered July 19, 2012, is hereby reversed.

Reversed.