**STATE OF WEST VIRGINIA**

**FILED**

**April 20, 2021**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*In re* **A.R. and A.B.**

**No. 20-0775** (Hampshire County 20-JA-1 and 20-JA-2)

**MEMORANDUM DECISION**

Petitioner Mother S.B., by counsel Stephanie E. Scales-Sherrin, appeals the Circuit Court of Hampshire County's September 2, 2020, order terminating her parental rights to A.R. and her custodial rights to A.B.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Lee Niezgoda, filed a response in support of the circuit court's order. The guardian ad litem, Marla Zelene Harman, filed a response on behalf of the children also in support of the circuit court's order. Intervenor paternal grandparents of A.R., J.R. and S.R., by counsel Jonathan G. Brill, filed a response in support of the circuit court's order. Petitioner filed a reply. On appeal, petitioner argues that the circuit court erred in adjudicating her as an abusing parent, granting the grandparents' motion to intervene prior to adjudication, denying her motion for an improvement period, and terminating her parental and custodial rights.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In January of 2020, the DHHR filed a child abuse and neglect petition after petitioner presented to the hospital with one-month-old A.R., who tested positive for buprenorphine. Specifically, the DHHR alleged as follows: On December 20, 2019, petitioner presented to Hampshire Memorial Hospital in Romney, West Virginia, with complaints that her one-month-old child, A.R., had slept through two feedings and was groggy and listless. Hospital staff diagnosed the child with an "air bubble." Petitioner and the child's father, L.R. ("the father"), subsequently left the hospital with the child and traveled to Winchester Medical Center in Winchester, Virginia.

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

The child tested positive for buprenorphine, a narcotic medication. The parents denied any history of substance abuse and informed hospital staff that the child had not been with anyone except for them. Hospital staff contacted Child Protective Services ("CPS"), and a CPS worker proceeded to the hospital to speak to the parents the following day. The parents reported observing the symptoms around 6 p.m. on December 20, 2019, and indicated that two persons, the father's sister-in-law, R.R., and her friend, T.D., had been at their house that day and held the child. The parents claimed that T.D. had a history of substance abuse and surmised that she must have had something on her skin when she held the child, which led to his absorbing buprenorphine. The CPS worker spoke to the child's treating physician, Dr. Jason Robertson. Dr. Robertson explained to the worker that buprenorphine would not metabolize through skin contact and that the drug had to have been orally ingested. Dr. Robertson further suggested that the levels of buprenorphine necessary to lead to the child's positive drug test result and the effects suffered by the child indicated that it was a "non-accidental amount." Dr. Robertson and the CPS worker confronted the parents about their explanation and informed them that "an accidental exposure such as that wouldn't produce the current effects, as the child had been asleep for more than 24 hours, and hadn't been aroused from sleep from any of the number of tests that had been done." Petitioner spoke to another CPS worker and denied any drug abuse issues. Petitioner commented that, despite rumors of a history of drug abuse, the father did not abuse drugs. The parents submitted to drug screens and both tested negative for any substances.

On December 27, 2019, the father called a CPS worker and left a lengthy voicemail, explaining that he wanted to "come clean" and explain how the child had ingested buprenorphine. The father claimed that he had been abusing nonprescribed buprenorphine, unbeknownst to petitioner, and possibly transferred the substance to the child's bottle. The father explained that on the day prior to the child's exhibiting symptoms, he placed a small piece of buprenorphine in his mouth and "let the juice build up" before spitting it into a half-filled water bottle. The father placed the water bottle on the kitchen table. After being informed of the child's symptoms the next day, the father observed that the water bottle was empty and next to the child's formula. The father questioned petitioner about whether she used the water to make the child's bottle, and she confirmed that she had done so. According to the father, "[t]hat's how [buprenorphine] got into his system."

Subsequently, the paternal grandmother contacted the CPS worker and reported that the father told her that he kissed the child and "was responsible for the baby [testing positive for buprenorphine] because of the kiss." The father also informed her that he was "going to take the fall." The grandmother denied that the father had a history of substance abuse and opined that he was lying about passing buprenorphine to the child through a kiss. The grandmother reported observing the child in distress as early as 2:00 p.m. on December 20, 2019, and stated that R.R. was concerned about the child's situation and opined that he ought to see a doctor. However, petitioner still had not taken the child to the doctor by 4:00 p.m. The grandmother also reported that petitioner had been in the company of petitioner's friend, A.L., that day.

Lastly, the DHHR alleged that the parents refused to return calls from a service provider to provide a mouth swab for drug testing. The parents waived their preliminary hearings.

The multidisciplinary team ("MDT") held a meeting later in January of 2020. Petitioner and the father maintained that the child must have ingested buprenorphine after petitioner unknowingly made a bottle with water that the father had spit into after consuming buprenorphine.

The paternal grandparents filed a motion to intervene on February 5, 2020. The circuit court entered an order granting the motion that same day. On February 6, 2020, the circuit court held a hearing on "adjudicatory matters." Petitioner objected to the grandparents' motion to intervene. The circuit court noted petitioner's objection, but remarked that it was granting the motion to intervene, stating "I've granted this in similar cases where we have grandparents that are intimately involved with the case and ones where they have custody of the children or child in this case." The circuit court deferred its ruling on petitioner's motion for a preadjudicatory improvement period. The circuit court issued an order memorializing its findings regarding the motion to intervene on February 19, 2020.

After continuances due to the COVID-19 pandemic, the circuit court held an adjudicatory hearing in June of 2020. The parents stipulated that A.R. tested positive for buprenorphine so that medical personnel did not have to testify to that fact. Petitioner testified regarding the day A.R. was taken to the hospital. Petitioner testified that she fed A.R. a bottle around 6:00 a.m. and that she and a friend, A.L., left the home around 9:00 a.m. to go to the bank and Chick-fil-a. While petitioner entered the bank, A.L. fed the child a bottle in the car. Petitioner took the child into Chick-fil-a to change his diaper and then left. Petitioner and A.L. returned to the home after dropping the car off to the paternal grandfather, and the child appeared to be in good health. After returning home, petitioner left the child in the care of his aunt, R.R., so that petitioner could attend a Christmas party at A.B.'s school at approximately 1:00 p.m. While petitioner was at the party, R.R. texted petitioner and asked her whether the child normally whined in his sleep. Petitioner responded that he occasionally whined when he was overtired. Petitioner testified that, upon returning home around 2:00 p.m., she observed that the child was sleepier than usual. Petitioner testified that the child's condition became more concerning, and she and R.R. proceeded to Hampshire Memorial Hospital around 5:47 p.m. Petitioner testified that she had the child's oxygen checked, and upon finding nothing wrong, returned to the car about five or ten minutes later. She further stated that she did not have to provide any payment information or fill out any forms. Petitioner testified that after leaving that hospital, she met the father as they intended to proceed to Winchester, Virginia. However, they needed gasoline and petitioner had forgotten her wallet at home. As such, the father dropped petitioner and the child off at Hampshire Memorial Hospital again after 6:00 p.m. After approximately two hours, the child was diagnosed with a gas bubble. Petitioner testified that she and the father decided to take the child to Winchester Medical Center, where he eventually tested positive for buprenorphine. Petitioner testified that she had no suspicions that either A.L. or R.R. used buprenorphine or caused the child to ingest the substance.

Petitioner testified that she was "not sure" how the child ingested buprenorphine but theorized that the father made a bottle for the child after taking the substance and that he transferred it from his hands onto the nipple of the bottle. Petitioner admitted that she previously authored a signed statement to hospital staff in which she had claimed that a man approached A.R. at the bank and touched his face, implying that the child tested positive for buprenorphine as a result of the contact. Petitioner claimed that she fabricated the encounter because she was scared and mitigated her actions by explaining that she left the statement on a table rather than handing it to anyone

directly. Petitioner also admitted that she colluded with the father when he claimed to have spit buprenorphine into a water bottle that was used to make a bottle for the child. Petitioner further admitted that she and the father maintained the false story for nearly two months.

R.R. testified and confirmed that she watched A.R. on December 19, 2019, that the child was fussy while asleep, and that petitioner told her that the child whined while sleeping if overly tired. At some point, the situation was made known to the paternal grandmother and, following the grandmother's prompting, petitioner eventually agreed to take the child to the emergency room. R.R. testified that she took petitioner and the child to Hampshire Memorial Hospital and dropped them off at 5:47 p.m. Petitioner returned to the car not long after and claimed that the child's oxygen levels were good and that they could proceed to see the child's pediatrician in Winchester, Virginia. R.R. then met the father so that petitioner and the child could travel with him to Winchester. R.R. testified that petitioner later texted her that they were returning to Hampshire Memorial Hospital because she was not comfortable traveling all the way to Winchester. Another witness, A.L., also testified about traveling to the bank and Chick-fil-a with petitioner. She denied having abused buprenorphine and denied dosing the child with the same.

Sandy Lewis, the records clerk at Hampshire Memorial Hospital, testified that petitioner was seen at the emergency room only once on December 19, 2019. When presented with petitioner's claims that she was permitted to bypass the information desk and obtain an oxygen reading on the child without providing any personal information or payment information at her first visit, Ms. Lewis testified that she had never heard of the hospital providing a service without registering the patient in the twenty-two years she had worked there.

Dr. Robertson testified regarding the child's diagnosis and treatment and opined that there was no way for the five-week-old child to have ingested the substance on his own. Dr. Robertson testified that he questioned the parents as to how the child could have ingested buprenorphine and stated that there "were no answers that were reasonable or forthcoming." Dr. Robertson also noted that petitioner provided a few different timelines of what happened on the day she presented the child to the hospital. At first, petitioner told Dr. Robertson that no one else had been around the child that day. Later, petitioner indicated that a family member cared for the child while she went to a party. Dr. Robertson stated,

> And so there were a couple different, you know, explanations for the timeline of events and if I recall also some different explanations for incidental exposure, maybe it was in the air, maybe it was on somebody's hands we don't know and, I think, I responded the same way I would have today that I've taken care of infants and babies whose mothers and fathers are in recovery in all these medicines and yet never had a patient with toxicity from the medicine.

On cross-examination, Dr. Robertson described petitioner's reaction to learning of the child's testing positive for buprenorphine as "taken aback and surprised." Dr. Robertson also opined that petitioner demonstrated an appropriate level of concern for the child.

The father testified and admitted to fabricating a story about spitting buprenorphine into a bottle which was used to make the child's formula. The father further admitted to maintaining that

story for two months before reporting that it was false. When asked how the child ingested buprenorphine, the father maintained that he did not know how the child consumed the substance but conceded that he was the only person in the home abusing the substance and that "inadvertently . . . something I did had to lead to it." The father theorized that a strip of buprenorphine melted onto his fingers and that he must have unknowingly transferred it to the nipple of a bottle he prepared. The father denied intentionally feeding the child buprenorphine and denied any knowledge that anyone else intentionally dosed the child.

The paternal grandmother testified that neither petitioner nor the father had provided her with an explanation of how the child ingested buprenorphine and stated, "I don't think I'll ever know." The grandmother testified that she heard several improbable stories provided by the parents since the proceedings began, including that the grandmother had been accused of buying nonprescribed buprenorphine and giving it to R.R. to give to the child. The grandmother also testified that she heard petitioner advise Dr. Robertson that the child had been touched by a man in the bank, contrary to petitioner's testimony. However, Dr. Robertson had reportedly explained that indirect contact would not cause the child to test positive for buprenorphine. The grandmother opined that the father would do anything to protect his child and that he was not in the home that day and could not have known what occurred. According to the grandmother, the child's exposure "fell on [petitioner's] watch . . . and she wasn't forthcoming."

Petitioner presented the testimony of a nurse practitioner who indicated that petitioner submitted to drug screens twice weekly and never tested positive for any illegal or controlled substances except for alcohol on one occasion.

By order entered on June 8, 2020, the circuit court found that it had been presented with "complicated factual scenarios as to how this infant child consumed buprenorphine with multiple prevarications as advanced by the [parents], some of which were recanted and remain unexplained." The court noted several examples including the father's claim concerning the child's bottle and petitioner's claim that an unknown man had touched the child in a bank. Further, petitioner claimed that she presented to Hampshire Memorial Hospital twice while the hospital had records of only one visit. Although the ability of the child to consume buprenorphine remained unexplained, the circuit court found that petitioner either neglected the child by permitting him to accidentally consume buprenorphine or abused the child by intentionally administering the substance to the five-week-old baby. Accordingly, petitioner was adjudicated as an abusing or neglecting parent.

The circuit court held a dispositional hearing in July of 2020. A DHHR worker testified that petitioner participated in drug screens and parenting and adult life skills classes as directed. However, petitioner never offered a reasonable explanation for the child's ingesting buprenorphine. Two service providers also testified that petitioner adequately participated in supervised visits, along with other services. The issue of how the child tested positive for buprenorphine, however, remained unanswered. Given petitioner's refusal to provide an adequate explanation, the DHHR recommended termination of her parental rights.

Petitioner testified that she would comply with an improvement period if she were granted one and stated that she believed she could protect the children from a similar situation in the future.

Petitioner also testified that she complied with all services offered and sought out therapy on her own. However, petitioner maintained that she did not know how the child ingested buprenorphine.

By order entered on September 2, 2020, the circuit court found that petitioner was unwilling or unable to provide adequately for the children's needs and that she could not provide a sustainable, safe home for them. The circuit court found that the child ingested buprenorphine while he was in petitioner's physical custody and that petitioner never provided a reasonable explanation as to how the five-week-old child was able to do so. The court found, "[n]ot only did this infant child sustain a traumatic and unexplained injury while in the care of [petitioner], the situation was made worse by multiple prevarications made by her during the course of the case." Petitioner "failed to be above-board with her knowledge of the situation" and colluded with the father as to the source of the buprenorphine being a contaminated water bottle. She refused to identify the source of the drug, reduced to writing an admittedly false scenario, recanted the explanations she gave to the circuit court, and repeatedly contended that she did not know how the child consumed buprenorphine. Moreover, petitioner's refusal or failure to provide an explanation rendered the residence unsafe for A.B. as well. The circuit court found that petitioner demonstrated that she was unwilling to cooperate or participate with the terms of the family case plan and that without admitting how the child was permitted access to the substance, there were no parenting deficiencies that could be addressed. Accordingly, the circuit court concluded that there was no reasonable likelihood that petitioner could correct the conditions of abuse or neglect in the near future and terminated petitioner's parental rights to A.R. and her custodial rights to A.B., as recommended by the DHHR. Petitioner appeals the circuit court's dispositional order.[2]

The Court has previously established the following standard of review in cases such as this:

"Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner first argues that the circuit court erred in granting the grandparents' motion to intervene for three reasons. First, petitioner argues that she was not provided proper

_____

[2]A.R.'s father's parental rights were terminated below. The permanency plan for the child is adoption by the intervenor grandparents. A.B.'s father was deemed a nonabusing parent and the permanency plan for A.B. is to remain in his care.

6

notice of the motion or sufficient time to respond given that it was granted merely hours after it was filed. Petitioner avers that granting the motion violated Rule 17(c)(1) of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings, Rule 6(d) of the West Virginia Rules of Civil Procedure, and Rule 6.01(c) of the West Virginia Trial Court Rules. Second, petitioner argues that the circuit court erred in granting the motion prior to adjudication. The grandparents were already provided a meaningful opportunity to be heard in a limited fashion pursuant to West Virginia Code § 49-4-601(h), so intervention was unnecessary at that time. Permitting the grandparents to intervene prior to adjudication allowed for them to interfere with petitioner's rehabilitative and reunification efforts. Specifically, the paternal grandmother testified at adjudication and she was not required to be sequestered during the other witnesses' testimony due to her intervenor status. The grandparents' counsel was permitted to cross-examine petitioner and continually suggested that the parents purposefully poisoned the child. As a result, the grandparents clearly aligned their desires with the DHHR and acted against petitioner, in spite of this Court's holding that foster parents should not interfere with the fact-finding portion of the proceedings. Moreover, the grandparents were not entitled to intervene as a matter of right because the case was still in its early stages. Third, the circuit court's reasoning in granting the motion to intervene—that it had done so in other cases where the grandparents were "intimately involved" and had custody of the children—was also flawed. Petitioner contends that the grandparents' intimate involvement and placement of the children "is exactly why their role . . . should have be[en] distinct from the fact-finding portions of the case" so as not to unfairly prejudice the circuit court against her. Based on the foregoing, petitioner contends that she was prejudiced by the premature grant of the grandparents' motion to intervene.

We find no error. At the outset we note that "Rules 5(b), 5(e) and 80 [of the West Virginia Rules of Civil Procedure] apply, but the other rules do not apply, to juvenile proceedings brought under the provisions of chapter 49 [§ 49-1-1 et seq.] of the West Virginia Code." W. Va. R. Civ. P. 81. Accordingly, petitioner's claim that the circuit court violated Rule 6(d) of the West Virginia Rules of Civil Procedure in granting the grandparents' motion to intervene is without merit as it does not apply to abuse and neglect proceedings.

Likewise, the circuit court did not violate Rule 6.01(c) of the West Virginia Trial Court Rules. Rule 6.01 provides: "Except by permission or order of the court, no pleading shall be filed less than forty-eight (48) hours prior to oral presentation or argument of a proceeding." Although the grandparents filed a motion to intervene less than forty-eight hours prior to the February 6, 2020, hearing, the circuit court permitted the filing of the motion, which is permissible under Rule 6.01. Given the deference provided to the circuit court in applying this timeframe, we cannot find that it erred in permitting the filing of the grandparents' motion despite it having been filed less than forty-eight hours prior to the hearing.

Although petitioner states that the circuit court erred in granting the grandparents' motion because it violated Rule 17(c)(1) of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings, her argument actually states that the motion was not accompanied by a notice of hearing. Rule 17(c)(4) provides that "[a]ll motions must be accompanied by or contained within a notice of hearing setting forth the date and time of hearing on the motion." While petitioner correctly points out that the grandparents failed to include a notice of hearing, she does not argue that she was prevented from adequately responding to the motion due to the lack of notice. Rather,

she simply argues that she was not provided notice or an opportunity to respond. We disagree, given that petitioner was permitted to respond to the motion at the hearing held on February 6, 2020. Regarding petitioner's claim that she was not provided adequate notice of the motion before the circuit court granted it, we note that the circuit court permitted petitioner to object to the motion at the hearing held the following day and later issued a new order memorializing its findings regarding granting the grandparents' motion despite petitioner's objections. Accordingly, under the circumstances of this case, we find that petitioner's due process rights were not violated and that she is entitled to no relief in this regard.

We further find that petitioner was not prejudiced by the circuit court's granting of the grandparents' motion prior to adjudication. The adjudicatory order sets forth that petitioner was adjudicated as an abusing or neglecting parent based upon her inability or refusal to explain how the child tested positive for buprenorphine. The circuit court determined that petitioner either neglected the child by permitting him to accidentally consume buprenorphine or abused the child by intentionally dosing him. Having reviewed the record, it is clear that these findings were supported by the evidence presented. Petitioner and the father stipulated that the child tested positive for buprenorphine. Petitioner testified that she was "not sure" how the child had done so but admitted that she had provided explanations for how the child had ingested the substance that she knew to be false. Moreover, the timeline established by petitioner and other witnesses showed that petitioner had physical custody of the child the entire day except for a brief trip into the bank and the hour she attended her other child's school Christmas party. Dr. Robertson explained that petitioner's different explanations for how the child tested positive for buprenorphine were unlikely as he had never encountered those scenarios before despite having treated several children whose parents used buprenorphine as part of their recovery treatment. The father also admitted that he fabricated explanations for how the child tested positive for the substance and that petitioner colluded with him on at least one occasion. As such, even absent the grandmother's testimony and the grandparents' counsel's cross-examination and argument, there was sufficient evidence to support petitioner's adjudication. Accordingly, petitioner is unable to establish that the grandparents' participation at adjudication prejudiced her or that the circuit court would have declined to adjudicate her absent the grandparents' involvement. Under the limited circumstances of this case, we find that petitioner is entitled to no relief in this regard.[3]

Petitioner similarly argues that the circuit court erred in adjudicating her as an abusing parent. Petitioner contends that there was insufficient evidence to adjudicate her, as supported by the circuit court's comment that "there was no good explanation for what happened." Petitioner further points out statements made by the circuit court that she contends indicate that the circuit

---

[3]Although we find no error with the circuit court's granting of the grandparents' motion to intervene prior to adjudication under the particular circumstances of this case, in light of the circuit court's acknowledgement that it has allowed grandparents having custody of the subject child or children to intervene in similar cases, we caution that the better practice would be for the circuit court to comply with Syllabus Point 3 of *State ex rel. C.H. v. Faircloth*, 240 W. Va. 729, 732, 815 S.E.2d 540, 542 (2018), in which we held, in relevant part, that "[t]he foster parents' involvement in abuse and neglect proceedings should be separate and distinct from the fact-finding portion of the termination proceeding."

court was unsure of its decision and, therefore, that the decision was made upon less than the clear and convincing evidence required to adjudicate her. Petitioner further argues that the circuit court wrongfully shifted the burden to petitioner to demonstrate how the accidental ingestion occurred rather than requiring the DHHR to prove that petitioner was negligent or abusive in causing the ingestion to occur. Petitioner likens her case to *In re Walter G.*, 231 W. Va. 108, 743 S.E.2d 919 (2013). In *Walter G.*, a child died due to buprenorphine consumption coupled with a dose of Benadryl. *Id*. at 111-12, 743 S.E.2d at 922-23. The parents were unable to provide an explanation as to how the young child ingested the substance, and the circuit court adjudicated the mother based upon her inability to provide an explanation. *Id*. at 113, 743 S.E.2d at 924. This Court found that the circuit court's decision that the child's consumption of the drug was nonaccidental was clearly erroneous given that neither parent was prescribed or abused the substance, neither parent had any knowledge of anyone in the home using the substance, and investigations by both the police and CPS into the source of the substance were unsuccessful. *Id*. at 114-16, 743 S.E.2d at 925-27. Petitioner contends that this situation is nearly identical to the case at bar and that, as such, she should not have been adjudicated.

We have previously held that

> [a]t the conclusion of the adjudicatory hearing, the court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected . . . . The findings must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence.

*In re F.S.*, 233 W. Va. 538, 544, 759 S.E.2d 769, 775 (2014). This Court has explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *Id.* at 546, 759 S.E.2d at 777 (citation omitted). However, "the clear and convincing standard is 'intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.'" *Id.* (citation omitted). Further, West Virginia Code § 49-1-201 defines "abused child" as "[a] child whose health or welfare is being harmed or threatened by . . . [a] parent . . . who knowingly or intentionally inflicts, attempts to inflict, or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home." Moreover, a "neglected child" is defined as a child

> [w]hose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, supervision, medical care, or education, when that refusal, failure, or inability is not due primarily to a lack of financial means on the part of the parent, guardian, or custodian.

*Id.*

We begin by noting that *Walter G.* is distinguishable in three critical ways. First, the child in *Walter G.* was nearly one year old when he died due to ingesting a combination of buprenorphine and Benadryl, and he was old enough to be placed on the floor and crawl or move around on his

own. *Walter G.*, 231 W. Va. at 110, 743 S.E.2d at 921. In fact, on the night of his supposed accidental dosing, the child was reported to have "pushed a bag of baby wipes around on the floor and, at one point, fell asleep." *Id*. Here, the child was only five weeks old at the time he tested positive for buprenorphine. There is simply no way that the child could have moved around and found the substance on his own or lifted it to his mouth, unlike the child in *Walter G.* Second, the record was clear that no adults who encountered the child in *Walter G.* on the day of his dosing were ever found to have had a prescription for, abused, or otherwise possessed buprenorphine. *Id.* at 112, 743 S.E.2d at 932. In the instant case, the father admittedly abused the substance for at least two months prior to A.R.'s ingesting the substance. While petitioner claimed that she had no knowledge of the father's substance abuse, the fact remains that buprenorphine was conclusively proven to be in her residence, and this is a glaring factual distinction from *Walter G.* Third, the parents in *Walter G.* consistently maintained that they did not know how their child ingested buprenorphine and they complied with investigations by both the police and CPS. *Id.* at 116, 743 S.E.2d at 927. Petitioner and the father in the instant case, on the other hand, presented a myriad of excuses as to how their five-week-old child ingested buprenorphine, none of which were determined to be a reasonable. Petitioner admittedly lied to CPS workers for a minimum of two months during the proceedings, misleading the MDT members and the circuit court as to what occurred. Further, petitioner admitted to writing down a knowingly false statement indicating that the child might have been touched by a man in the bank despite later admitting that she never took the child in the building. Accordingly, petitioner's actions go beyond claiming that she had no idea what happened to actively perpetrating fraud upon the court and misleading the DHHR and other parties as to what occurred. We lastly note that in *Walter G.*, the DHHR conceded that the circuit court likely made a mistake in its order when it found that the child's ingesting buprenorphine was "non-accidental." *Id*. at 114, 743 S.E.2d at 925. For these reasons, petitioner's reliance on *Walter G.* is misplaced.

Having reviewed the record, we cannot find that the circuit court erred in adjudicating petitioner as an abusing or neglecting parent. The circuit court determined that the child was either intentionally dosed with buprenorphine or was neglected such that an accidental consumption of the substance occurred. The record shows that, aside for the time during which petitioner was in the bank and for approximately one hour during which she was at A.B.'s Christmas party, petitioner had physical custody and control of the child on the day he showed symptoms. Importantly, after learning the child's diagnosis, petitioner actively misled CPS workers and medical personnel by providing knowingly false accounts of what could have happened. Petitioner colluded with the father and provided one explanation for two months before admitting that she had fabricated the story. While petitioner claims that the circuit court placed the burden on her to prove that the child's consumption of buprenorphine was an accident, this argument has no basis in the record. On the contrary, the DHHR proved that the child was either given the drug or permitted to ingest it, and it was incumbent upon petitioner to rebut this evidence in her defense at adjudication. Further, we note that we have frequently upheld the adjudication of parents or the termination of their parental rights when they are unable or unwilling to explain injuries to their children under certain circumstances. *See In re Taylor B.*, 201 W. Va. 60, 491 S.E.2d 607 (1997) (finding that the circuit court erred in refusing to terminate the parent's parental rights when medical testimony established the child's injuries were nonaccidental and when the parents denied that the abuse occurred); *In re A.B.*, No 14-0576, 2014 WL 5334055 (W. Va. Oct. 20, 2014)(memorandum decision) (finding that the circuit court's determination that the DHHR

proved the child's abuse by his parents through clear and convincing evidence was not erroneous when the parents' explanations regarding the child's injuries were inconsistent with the child's injuries and when neither parent offered any evidence regarding the cause of the injuries); *In re K.F.-1*, No. 20-0428, 2020 WL 7259191 (W. Va. Dec. 10, 2020)(memorandum decision) (finding no error in the circuit court's termination of the father's parental rights when he failed to identify the perpetrator of abuse against his child and failed to provide a reasonable explanation for the injuries); *In re S.H.*, No. 20-0562, 2021 WL 360020 (W. Va. Feb. 2, 2021)(memorandum decision) (finding that the circuit court did not err in terminating the father's parental rights when he refused to acknowledge the injuries caused to his children or provide any explanations for them). Accordingly, based on the evidence including: the child's age; the fact that petitioner exercised custody and control over the child for the overwhelming majority of the day; and the petitioner not only failing to provide a reasonable explanation for the child's consumption of buprenorphine, but actively colluding with the father to deceive the court and the parties as to how it happened for an extended period, we find no error in the circuit court's decision to adjudicate her as an abusing or neglecting parent.

To the extent petitioner argues that the circuit court erred in adjudicating her as an abusing parent with regard to A.B., we note that the definition of an abused child includes injury inflicted "upon the child or another child in the home." Here, the circuit court found that A.R. was an abused or neglected child and that A.B. was his sibling. The record demonstrates that petitioner shared custody of the child with the child's father and that the child resided in the house during that time. Accordingly, we find no error in the circuit court adjudicating petitioner with regard to A.B.

Petitioner next argues that the circuit court erred in denying her an improvement period when she acknowledged harm had come to the child and proved that she would comply with services given her compliance with services throughout the proceedings. Specifically, petitioner stipulated that the child ingested buprenorphine at adjudication and cooperated with the DHHR by voluntarily engaging in remedial services as requested. In fact, the service providers and caseworker testified that petitioner was cooperative and compliant with services. Additionally, petitioner never tested positive for drugs and actively participated in parenting and adult life skills classes and supervised visits with the child. Petitioner also separated from the father and was no longer living with him by the time of the dispositional hearing. Petitioner contends that the circuit court erred in penalizing her when the child's exposure to buprenorphine "was accidental and logically occurred due to [the father's] unknown use of the same." Petitioner further points out that the father tested positive for his prescribed buprenorphine, as well as alcohol, amphetamine, and methamphetamine, throughout the proceedings.

We find that the record reveals no abuse of discretion in denying petitioner an improvement period. Syl. Pt. 6, in part, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996) ("It is within the court's discretion to grant an improvement period within the applicable statutory requirements. . . ."); *In re M.M.*, 236 W. Va. 108, 115, 778 S.E.2d 338, 345 (2015) ("West Virginia law allows the circuit court discretion in deciding whether to grant a parent an improvement period."). Further, this Court has established that "[t]he circuit court has the discretion to refuse to grant an improvement period when no improvement is likely." *In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002). While petitioner relies on the fact that she stipulated that the child ingested buprenorphine, she failed to acknowledge her actions and refused to provide a reasonable

explanation for how the child came into contact with the substance. Although petitioner places blame on the father, the record is clear that he was at work on the day in question and that it was petitioner who cared for the child on that day. Moreover, petitioner repeatedly lied about what happened to the child for nearly two months. Despite petitioner's claims that she participated in remedial services, the fact remains that she failed to provide an adequate explanation for what occurred to the child. As this Court has long held, "[i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem . . . results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense." *In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted). Because petitioner rendered the conditions of abuse and neglect untreatable, we find no error in the denial of her motion for an improvement period.

Petitioner lastly argues that the circuit court erred in terminating her parental rights when the DHHR failed to file its case plans and disclosures at least five days prior to the dispositional hearing pursuant to Rules 29 and 30 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings. Petitioner contends that this failure violated her due process rights. Further, petitioner avers that she was prejudiced when the circuit court failed to hear testimony and argument on the issue of her improvement period prior to the testimony taken for disposition. She claims that "the opposing parties immediately began to argue for termination of parental rights, so that the court then ignored the pending motions for [an] improvement period and began a termination proceeding." Petitioner concedes, however, that the matter was set for disposition and that she did not object to proceeding in that fashion. She nevertheless maintains that she was prejudiced by the lack of notice regarding the DHHR's recommendation as to disposition and a list of proposed witnesses with summaries of their testimony. Petitioner also acknowledges that the guardian requested that the circuit court take notice of the fact that the case plan was filed and that the circuit court included such language in its dispositional order, but claims that there is no documentation to support such a claim. Accordingly, petitioner claims that this Court should vacate and remand the proceeding with instructions to restore her rights to the children.

Rule 29 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings provides that "[c]opies of the child's case plan shall be provided to the parties, their counsel, and persons entitled to notice and the right to be heard, at least five (5) judicial days prior to the disposition hearing." While petitioner argues that no documentation was submitted demonstrating that case plans were filed, we note that "[i]t is a paramount principle of jurisprudence that a court speaks only through its orders." *Legg v. Felinton*, 219 W. Va. 478, 483, 637 S.E.2d 576, 581 (2006) (citation omitted). The circuit court's dispositional order acknowledges that the DHHR timely filed a case plan in accordance with Rule 29. Petitioner was provided the opportunity to submit proposed findings and failed to raise any objection to the DHHR's alleged failure to file any case plans or any disclosures pursuant to Rule 30. Further, at the dispositional hearing, the guardian requested the circuit court to take notice of the same on the record, which it did. Petitioner failed to object or to raise any issue with the DHHR's alleged failures with regard to these disclosures and she failed to assert that she was unaware of the DHHR's position such that she was surprised or blindsided by their recommendation for termination of her parental rights. Accordingly, if there was any error, petitioner has waived this issue by failing to object to the case plan at any point in the proceedings. *Noble v. W. Va. Dep't of Motor Vehicles*, 223 W. Va. 818, 821, 679 S.E.2d 650, 653 (2009) ("'Our general rule is that nonjurisdictional questions . . . raised for the first time on appeal, will not be

considered.' *Shaffer v. Acme Limestone Co., Inc.*, 206 W.Va. 333, 349 n.20, 524 S.E.2d 688, 704 n.20 (1999).").

Even assuming that the DHHR failed to make the disclosures required by Rules 29 and 30 and that the issue had not been waived, we find that petitioner was in no way prejudiced by these alleged failures. "The purpose of the family case plan as set out in [W. Va. Code § 49-4-408] is to clearly set forth an organized, realistic method of identifying family problems and the logical steps to be used in resolving or lessening these problems." Syl. Pt. 2, *In re Desarae M.*, 214 W. Va. 657, 591 S.E.2d 215 (2003) (citation omitted). Petitioner was adjudicated based upon her failure to provide a reasonable explanation for how the child was exposed to buprenorphine, and the circuit court found that the child was either intentionally dosed or neglected such that he was permitted to accidentally ingest the substance. As such, petitioner was aware that the issue that needed corrected was her unwillingness or refusal to identify how the child ingested the drug. In fact, the DHHR opined that it would not need much time to present evidence at disposition "unless something happens between now and then." We have held that

> [w]here it appears from the record that the process established by the Rules of Procedure for Child Abuse and Neglect Proceedings and related statutes for the disposition of cases involving children adjudicated to be abused or neglected has been substantially disregarded or frustrated, the resulting order of disposition will be vacated and the case remanded for compliance with that process and entry of an appropriate dispositional order.

Syl. Pt. 5, *In re Edward B.*, 210 W. Va. 621, 624, 558 S.E.2d 620, 623 (2001). If there was an error that was not waived, we find that the proceedings were not so frustrated as to warrant vacating and remanding the case.

Concerning petitioner's claim that the circuit court erred in failing to consider evidence regarding her motion for an improvement period prior to and separate from evidence relating to the termination of her parental rights, we find no error. The circuit court made clear at the adjudicatory hearing that it would be considering both the motion and disposition. While the circuit court initially indicated that it would consider petitioner's motion prior to the presentation of any evidence related to disposition, the record demonstrates that petitioner informed the circuit court which witnesses she intended to present and failed to object when the circuit court stated its intention to hear the evidence together. As noted above, we will not consider nonjurisdictional issues raised for the first time on appeal. *Noble*, 223 W. Va. at 821, 679 S.E.2d at 653. Moreover, petitioner fails to demonstrate how she was prejudiced by the circuit court proceeding to hear evidence together when it held its ruling in abeyance to allow the parties to provide proposed findings, taking time to consider all of the evidence, which was sufficient upon which to base the termination of petitioner's parental rights, in rendering its decision. Accordingly, we find that petitioner is entitled to no relief in this regard.

For the foregoing reasons, we find no error in the decision of the circuit court, and its September 2, 2020, order is hereby affirmed.

Affirmed.

**ISSUED**: April 20, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton